**FOUR SEASONS MANUFACTURING, INC., Appellant–Defendant,**

v.

**1001 COLISEUM, LLC, Appellee–Plaintiff.**

No. 02A04–0606–CV–343.

Court of Appeals of Indiana.

July 20, 2007.

Timothy J. Abeska, Damon R. Leichty, Barnes & Thornburg LLP, South Bend, IN, Attorneys for Appellant.

Michael H. Michmerhuizen, Samuel J. Talarico, Jr., Barrett & McNagny LLP, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Four Seasons Manufacturing, Inc. (FSM), appeals the trial court's judgment in favor of appellee-plaintiff 1001 Coliseum, Inc. (Coliseum). FSM raises the following arguments: (1) the trial court erred by not granting summary judgment in favor of Four Seasons Housing Factory Outlet, LLC (FiSHFO), and

(2) the trial court erred by piercing the corporate veil of Northern Indiana Housing Factory Outlet, LLC (NiHFO), to hold FSM liable for $136,053.10. Additionally, Coliseum cross-appeals the trial court's finding that FSM was not liable under the Indiana Uniform Fraudulent Transfer Act (UFTA). Concluding that FSM is a debtor pursuant to the UFTA but that the damages award was proper, and finding no other error, we affirm the judgment of the trial court.

## FACTS

FSM manufactures homes. In May 2000, FSM and Michael Pesarchik organized FiSHFO as a retail outlet to sell manufactured homes, including homes built by FSM. FSM had a 75% membership interest in FiSHFO.

Music, Music, Inc. (MMI), was the owner of the commercial real estate located in Fort Wayne at issue herein (the Property). Mark Music was the sole shareholder of MMI at all times relevant to this action. Music was also the sole shareholder in Gallery Homes, Inc. (Gallery), a retailer of manufactured housing. MMI leased the Property to Gallery for the operation of an outlet store.

FiSHFO acquired Gallery on December 31, 2000, and Music became the Vice President of FiSHFO. Although FiSHFO had acquired Gallery, MMI still owned the Property, and on December 31, 2000, FiSHFO entered into a new five-year lease with MMI to occupy the Property. Read Morrison, FSM's Chief Financial Officer, drafted the "triple net lease," which provided that FiSHFO was responsible for the payment of rent, utilities, taxes and assessments, and maintenance of the Property. Appellant's App. p. 39.

In March 2001, Pesarchik left FiSHFO and Music assumed the position of President. Music remained the President for approximately one year until he resigned and surrendered his FiSHFO ownership interest in July 2002. As a result, FSM became the sole member of FiSHFO.

Patrick Tippmann and David Dumas were the members of Tippmann & Dumas, LLC, which was, in turn, the sole member of Coliseum. Coliseum was formed for the specific purpose of purchasing the Property. On June 28, 2002, Coliseum purchased the Property from MMI, rendering Coliseum FiSHFO's landlord with respect to the Property.

Shortly after the sale of the Property, Tippmann had a conversation with Austin Baidas—the President and CEO of FSM—about repairing the roof of the building on the Property. Tippmann and Baidas disagreed about whether Coliseum or FiSHFO was responsible for making the repairs. Baidas later told Music about the dispute with Coliseum and alerted him that, because of the dispute, FiSHFO was going to vacate the Property.

FiSHFO vacated the Property on August 31, 2002. That same day, FiSHFO entered into an asset purchase agreement with NiHFO. Pursuant to the agreement, NiHFO assumed the leases for two other properties that FiSHFO was leasing, but it did not assume the lease for the Property owned by Coliseum. Morrison—the CFO of FSM—drafted, negotiated, and signed the asset purchase agreement between FiSHFO and NiHFO. As a result of the agreement, FSM became the sole member of both FiSHFO and NiHFO. NiHFO completed FiSHFO's pending sales, and signs reading "Four Seasons Outlet" remained outside of NiHFO's stores for at least three years. Tr. p. at 177–78; Exs. 26, 27.

On October 17, 2002, Coliseum filed a complaint against FiSHFO, alleging that FiSHFO had breached its lease with Coli-

seum. On April 2, 2003, FiSHFO filed a motion for summary judgment, which the trial court denied on September 17, 2003. The trial court subsequently granted Coliseum's two motions to amend its complaint, and Coliseum filed its second amended complaint on May 14, 2004, naming FiSHFO, NiHFO, FSM, MMI, Music, Four Seasons Housing, Inc., and FSH, Inc., as defendants.

After various claims where dismissed, Coliseum, FSM, NiHFO, and FiSHFO [1] proceeded to a bench trial on October 31, 2005. After the bench trial, the trial court determined that FiSHFO had breached its lease with Coliseum and entered a judgment for $172,759.68 against FiSHFO and NiHFO, which included future rent, utilities, taxes, insurance, cleanup and repair costs, and attorney's fees.[2] The trial court also entered judgment against FSM in the amount of $136,053.10, finding

72. ... that Coliseum has proven by a preponderance of the evidence that [FSM] ignored, controlled, or manipulated [NiHFO] in order to commit a fraud upon Coliseum, in that [FSM] formed [NiHFO] as a means of continuing the business of [FiSHFO] but without having to perform the obligations of the Lease with Coliseum.

73. [NiHFO] was formed and utilized by [FSM] to promote a fraud upon Coliseum, as a creditor of [FiSHFO]. [FSM] incorporated [NiHFO] just days before vacating the Property. Read Morrison, the Chief Financial Officer of [FSM], drafted and executed the Asset Purchase Agreement between [FiSHFO] and [NiHFO] on the same day that [FiSHFO] vacated the Property. [FSM], as the sole shareholder of both [FiSHFO] and [NiHFO], continued to operate [NiHFO] as the same type of business as [FiSHFO], at the same locations, and in fact, the business name displayed on the signs at two of the locations supposedly operated by [NiHFO] was Four Seasons Outlet.

74. The corporate entity of [NiHFO] should be disregarded with regards to the transfer of assets of [FiSHFO] to [NiHFO]. [FSM], as the sole shareholder of [FiSHFO], should [be] liable for the debt of [FiSHFO] to Coliseum in an amount no greater than the value of the assets of [FiSHFO] existing as of August 31, 2002, the date of the sale of the assets to [NiHFO], as a result of [FSM's] transfer of the assets of [FiSHFO] to [NiHFO].

* * *

79. With regards to Coliseum's claim that [FSM] violated I.C. 32–18–2 *et. seq.*, the Uniform Fraudulent Transfer Act, the Court determines that as of August 31, 2002, the date of the transfer of the assets from [FiSHFO] to [NiHFO], [FSM] was not a "debtor" as that term is defined by I.C. 32–18–2–6 because [FSM] was not liable on the claim of Coliseum against [FiSHFO]. Therefore, [FSM] is not liable to Coliseum pursuant to the provisions of the Uniform Fraudulent Transfers [sic] Act.

Appellant's App. p. 45–46. FSM appeals the trial court's judgment awarding $136,053.10 in favor of Coliseum. Coliseum cross-appeals the trial court's finding that FSM was not liable under the UFTA.

## DISCUSSION AND DECISION

■■■ This case turns on the interpretation of the lease between Coliseum [3] and

---

1. The same legal counsel represented FSM, FiSHFO, and NiHFO throughout the trial.

2. FiSHFO and NiHFO did not appeal the trial court's judgment.

3. While the original lease was between MMI

FiSHFO regarding the Property. The construction of a written contract is a pure question of law. *S.C. Nestel, Inc. v. Future Constr., Inc.*, 836 N.E.2d 445, 449 (Ind.Ct.App.2005). The unambiguous language of a contract is conclusive and binding on the parties and the court, and the parties' intent is determined from the four corners of the document. *Id.* We will neither construe unambiguous provisions nor add provisions not agreed upon by the parties. *Dick Corp. v. Geiger*, 783 N.E.2d 368, 374 (Ind.Ct.App.2003).

■■■ A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *First Fed. Sav. Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 604 (Ind.1990). If a contract is ambiguous or uncertain and its meaning is to be determined by extrinsic evidence, its construction is a matter for the fact finder. *Nestel*, 836 N.E.2d at 449–50. An ambiguous contract will be construed against the party that drafted it. *Dick Corp.*, 783 N.E.2d at 374. The terms of a contract are not ambiguous simply because a controversy exists between the parties concerning the proper interpretation of the language. *Id.*

■■■ The contract is to be read as a whole when trying to ascertain the parties' intent, and we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Nestel*, 836 N.E.2d at 450. The court must accept an interpretation of the contract that harmonizes its provisions, as opposed to one that causes the provisions to conflict. *Id.*

and FiSHFO, MMI assigned its interest to Coliseum on June 28, 2002, when Coliseum

## I. *Summary Judgment*

FSM argues that the trial court erred by denying FiSHFO's summary judgment motion. Specifically, FSM argues that the lease's plain language required the trial court to grant summary judgment in favor of FiSHFO as a matter of law.

■■■ We first note that a party that fails to bring an interlocutory appeal from the denial of a motion for summary judgment may still pursue appellate review after an entry of final judgment because the denial of the motion simply "places the parties' rights in abeyance pending ultimate determination by the trier of fact." *Villas W. II of Willowridge v. McGlothin*, 841 N.E.2d 584, 595–96 (Ind.Ct.App.2006). Consequently, although this case proceeded to trial and the trial court entered a final judgment on Coliseum's claims, we may still review the trial court's ruling on FiSHFO's motion for summary judgment. *Id.* Furthermore, although FSM challenges the trial court's adverse ruling on *FiSHFO's* motion for summary judgment—which FiSHFO filed before FSM was a party—FSM has standing to challenge that ruling because the ruling exposed FSM to liability. See *Traveler's Indem. Co. v. P.R. Mallory & Co.*, 772 N.E.2d 479, 483–84 (Ind.Ct.App.2002) (holding that a nonparty can challenge a trial court's ruling on a motion if the ruling impacts or injures the nonparty).

When reviewing a grant or denial of summary judgment, our well-settled standard of review is the same as it is for the trial court: we examine whether there is a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *City of N. Vernon v. Jennings Nw. Reg'l Util.*, 829 N.E.2d 1, 3

bought the Property from MMI. Ex. 2.

(Ind.2005). Summary judgment should be granted only if the evidence sanctioned by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and that the moving party deserves judgment as a matter of law. *Id.* We construe all evidence in favor of the opposing party and we resolve all doubts as to the existence of a material issue against the moving party. *Id.*

In its summary judgment motion, FiSHFO argued that the "Remedies of Landlord" provision of the lease was the only provision that provided for Coliseum's remedies in the event of a breach. FiSHFO directed the trial court to Paragraph 13 of the lease, which provided that "[i]f Tenant defaults in payment of rent, expenses or any other agreements contained in this Lease, Tenant will at once deliver peaceable possession of the Property to Landlord." Ex. 1 at ¶ 13. FiSHFO argued that the trial court should find as a matter of law that Coliseum's sole remedy was to obtain possession of the Property and that, because FiSHFO had already vacated the Property, Coliseum could not seek damages. Appellant's App. p. 56.

In its response, Coliseum argued that the lease did not evidence the parties' intent that possession was Coliseum's sole remedy in the event of a breach. Instead, Coliseum argued that FiSHFO "does not point to even *one word or phrase in paragraph 13 that evidences an intent that the remedy be exclusive.*" *Id.* at 82 (emphasis in original). In sum, Coliseum argued that the intent of the parties was a question of fact, rendering summary judgment inappropriate.

The trial court adopted Coliseum's argument and held that FiSHFO was not entitled to summary judgment as a matter of law because

[w]here there is no express or implied limitation in a contract that makes it clear that the stated remedy is exclusive, a party is free to elect to pursue the stated remedy or any other legal remedy. *Nave v. Powell* [52 Ind.App. 496], 96 N.E. 395, 398 (Ind.Ct.App.1911).

\* \* \*

While the heading for Paragraph 13 states "Remedies of Landlord," Paragraph 19(h) indicates that the headings in the lease are "for reference purposes only and shall not affect in any way the meaning or interpretation of this Lease." Therefore the heading in Paragraph 13, "Remedies of Landlord," cannot be relied upon to indicate any intent that the remedies provision was intended by the parties to be the exclusive remedy for the breach of the Contract. Accordingly, since there is a lack of proof that the parties intended Paragraph 13 of the Lease to be [Coliseum's] exclusive remedy for the breach of the agreement, [FiSHFO] is not entitled to a summary judgment as a matter of law.

Appellant's App. p. 34.

On appeal, FSM argues that "[t]his case should not have proceeded to trial based on the plain language of the lease.... The trial court erred by not deciding this issue in a manner favorable to FSM." Appellant's Br. p. 14. However, the parties' lease neither directly address alternative remedies nor states that possession is the sole remedy, and we apply common law principles when the parties do not contractually address an issue. *Jones v. W. Reserve Group,* 699 N.E.2d 711, 714 (Ind.Ct. App.1998).

As we have previously held, "[a] contract which excludes some remedy given by law should be so definite and positive in its terms as to show the clear intention of the parties to do so." *Simon Prop. Group, L.P. v. Mich. Sporting Goods*

*Distrib., Inc.,* 837 N.E.2d 1058, 1074 (Ind. Ct.App.2005) (citing *Strauss v. Yeager,* 48 Ind.App. 448, 93 N.E. 877, 882 (1911)). Therefore, even if a lease provides a specific remedy, a landlord has not been deprived "of any rights given by law, unless the terms thereof expressly restricted the parties to such specified remedy." *Simon Prop.,* 837 N.E.2d at 1074 (citing *Whitcomb v. Indianapolis Traction & Terminal Co.,* 64 Ind.App. 605, 116 N.E. 444, 445 (1917)).

While FSM may disagree, Paragraph 13 does not state that possession is Coliseum's sole remedy, and it does not bar Coliseum from seeking other remedies after it attained possession. Therefore, the trial court did not err by denying FiSHFO's request for summary judgment as a matter of law, and FSM's argument fails.

## II. FSM's Liability

FSM argues that the trial court erred by holding it liable for FiSHFO's breach. Specifically, FSM argues that (1) the trial court erred by interpreting the lease to allow Coliseum to pursue damages, (2) the trial court erred by piercing NiHFO's corporate veil to hold FSM liable, and (3) the damages award was contrary to law.

### A. Damages Remedy

■ FSM argues that the trial court applied an incorrect legal standard and misinterpreted the lease as a matter of law. Specifically, FSM argues that FiSHFO surrendered the Property to Coliseum and, based on the plain language of the lease, Coliseum had no further remedy once it accepted possession of the Property.

■ The appellant may attack the trial court's judgment only as being con-

trary to law, and we will affirm the trial court's judgment unless all evidence leads to the conclusion that the trial court's findings are clearly erroneous. *Truck City of Gary, Inc. v. Schneider Nat'l Leasing,* 814 N.E.2d 273, 278 (Ind.Ct.App.2004). We neither reweigh the evidence nor judge the credibility of the witnesses, and we consider only the evidence most favorable to the judgment together with all reasonable inferences that may be drawn therefrom. *Id.* However, the construction of the terms of a written contract, such as a lease, is a pure question of law, and we review such questions de novo. *Allstate Ins. Co. v. Bradtmueller,* 715 N.E.2d 993, 996 (Ind.Ct. App.1999).

In awarding damages, the trial court provided:

> [FiSHFO] failed to offer credible evidence that the parties to the Lease, [MMI and FiSHFO], intended that the only remedy for the breach of the Lease would be for the tenant to surrender possession to the landlord. Where there is no express or implied limitation in a contract that makes it clear that the stated remedy is exclusive, a party is free to pursue the stated remedy or any other legal remedy. *Nave v. Powell* [52 Ind.App. 496], 96 N.E. 395, 398 (Ind.Ct. App.1911).

Appellant's App. p. 38. The trial court noted that the parties' lease "does not contain language stating that possession of the Property is the exclusive or sole remedy of [ ] Coliseum" and "Paragraph 13 of the Lease does not preclude Coliseum from pursuing [FiSHFO] for damages resulting from the breach of the Lease." *Id.*

■ FSM disagrees with the trial court's citation to Nave [4] as support for its

---

4. As an initial matter, Coliseum contends that we do not need to address the merits of

FSM's argument because FSM invited the trial court's error by arguing for the *Nave* stan-

holding. However, as discussed above, it is well established that a contract must explicitly restrict the parties to a specified remedy if that was the parties' intent:

> [w]here a contract prescribes a remedy for a breach, that remedy is generally exclusive if the contract so declares or clearly shows the parties' intention to make it so.[5] Where, however, there is no express or implied limitation in the contract making the stated remedy exclusive, the prevailing view is that a party may pursue either the prescribed remedy or any other remedy the law provides....

17 Am.Jur.2d *Contracts* § 710 (2007); *see also Simon Prop.*, 837 N.E.2d at 1074.

Here, the parties' lease does not explicitly state that possession of the Property was Coliseum's sole remedy in the event of a breach, and its language does not bar Coliseum from seeking other remedies— e.g., damages. Therefore, we decline to read FSM's proposed terms into the lease, and we do not find that the trial court's remedy was contrary to law. Consequently, the trial court had the authority to award Coliseum damages, and FSM's argument fails.

### B. Piercing the Corporate Veil

FSM argues that the trial court erroneously pierced NiHFO's corporate veil. Specifically, FSM argues that the trial court did not properly weigh or analyze the factors applicable in this analysis.

 As a general rule, Indiana courts are reluctant to disregard corporate identity and do so only to protect third parties from fraud or injustice when transacting business with a corporate entity. *Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 564–65 (Ind.Ct.App.2002). When a court exercises its equitable power to pierce a corporate veil, it engages in a highly fact-sensitive inquiry; therefore, a trial court's decision to pierce the corporate veil will be accorded great deference. *Smith v. McLeod Distrib. Inc.*, 744 N.E.2d 459, 462 (Ind.Ct.App.2000). A party seeking to pierce the corporate veil bears the burden of establishing that the corporation was so ignored, controlled, or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice. *Gurnik v. Lee*, 587 N.E.2d 706, 710 (Ind.Ct.App.1992).

 In deciding whether the party seeking to pierce the corporate veil has met its burden, Indiana courts consider whether the party has presented evidence showing: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice, or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form. *Aronson v. Price*, 644 N.E.2d 864, 867 (Ind.1994).

 In a case such as this one where a plaintiff seeks to pierce the corporate veil in order to hold one corporation liable for another closely related corporation's debt,

---

dard before trial. However, FiSHFO—not FSM—argued for the *Nave* standard in its summary judgment motion before FSM was even a party to this action. And while it may be possible to impute FiSHFO's arguments to FSM through an in-depth analysis of the parties' specific arguments at trial, we prefer to address FSM's argument on the merits.

**5.** As support for this point, *American Jurisprudence* cites *Nave*, as well as numerous other federal and state cases.

the eight factors listed above are not exclusive. *Smith*, 744 N.E.2d at 463. In such cases, we may consider additional factors, including whether (1) similar corporate names were used; (2) the corporations shared common principal corporate officers, directors, and employees; (3) the business purposes of the corporations were similar; and (4) the corporations were located in the same offices and used the same telephone numbers and business cards. *Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1191 (Ind.Ct.App.2002). Indicia of common identity or single business enterprise corporations may include, among other factors, the intermingling of business transactions, functions, property, employees, funds, records, and corporate names in dealing with the public. *Smith*, 744 N.E.2d at 463.

■ Here, the trial court found:

72. With regards to Coliseum's claim that [FSM] ignored, controlled, or manipulated [NiHFO] in order to commit a fraud upon Coliseum, the Court finds that Coliseum has proven by a preponderance of the evidence that [FSM] ignored, controlled, or manipulated [NiHFO] in order to commit a fraud upon Coliseum, in that [FSM] formed [NiHFO] as a means of continuing the business of [FiSHFO] but without having to perform the obligations of the Lease with Coliseum.

73. [NiHFO] was formed and utilized by [FSM] to promote a fraud upon Coliseum, as a creditor of [FiSHFO]. [FSM] incorporated [NiHFO] just days before vacating the Property. Read Morrison, the Chief Financial Officer of [FSM], drafted and executed the Asset Purchase Agreement between [FiSHFO] and [NiHFO] on the same day that [FiSHFO] vacated the Property. [FSM], as the sole shareholder of both [FiSHFO] and [NiHFO], continued to operate [NiHFO] as the same type of business as [FiSHFO], at the same locations, and in fact, the business name displayed on the signs at two of the locations supposedly operated as [NiHFO] was Four Seasons Outlet.

74. The corporate entity of [NiHFO] should be disregarded with regards to the transfer of the assets of [FiSHFO] to [NiHFO]. [FSM], as the sole shareholder of [FiSHFO], should [be] liable for the debt of [FiSHFO] to Coliseum in an amount no greater than the value of the assets of [FiSHFO] existing as of August 31, 2002, the date of the sale of the assets to [NiHFO].

Appellant's App. p. 45–46.

It is undisputed that FSM was the sole member of FiSHFO and NiHFO. Tr. p. 168. At the outset, we observe that the timing of the events casts an initial cloud of suspicion over FSM. Not only did FSM incorporate NiHFO just days before FiSHFO vacated the Property, FSM orchestrated the asset purchase agreement between FiSHFO and NiHFO the very day that FiSHFO breached its lease with Coliseum—August 31, 2002. *Id.* at 166. In the asset purchase agreement, NiHFO assumed all of FiSHFO's leases *except* for the lease involving Coliseum. Ex. 40; Tr. p. 166–167. Furthermore, the asset purchase agreement provided that NiHFO would provide a non-interest bearing promissory note in the amount of $136,053.10 as consideration for purchasing FiSHFO's assets; however, that sale price "is substantially less than the amount [ ] of the income earned by [FiSHFO] during the year 2002" and "[NiHFO] has not made any payments on the promissory note, therefore, [NiHFO did] not give[ ] consideration for the purchase of the assets of [FiSHFO]." Appellant's App. p. 43.

Additionally, Morrison—FSM's CFO—drafted the asset purchase agreement by serving on "both sides of the table in the negotiation" even though he was not employed by either FiSHFO or NiHFO. Tr. p. 170. Morrison testified that he executed the agreement because "I handle that type of thing for [FSM]. We were simply cleaning the books." *Id.* As a result of the agreement, FiSHFO "ceased operations," "had no employees after that point," and became insolvent. *Id.* at 168, 180; Appellant's App. p. 46. Morrison admitted that if the trial court determined that FiSHFO was liable to Coliseum under the lease, NiHFO would be liable for those debts and obligations because of the asset purchase agreement. *Id.* at 173–74.

After the asset purchase agreement, NiHFO operated in the same line of business as FiSHFO by selling manufactured homes. NiHFO did business at FiSHFO's old locations and even "completed [FiSHFO's] pending sales." *Id.* at 176. In May 2005—almost three years after NiHFO had purchased FiSHFO's assets—large display signs outside of multiple NiHFO locations read "Four Seasons Housing Factory Outlet." *Id.* at 177–78; Exs. 26, 27. These factors support the trial court's conclusion that FiSHFO's assets were transferred to NiHFO to avoid the potential liability stemming from FiSHFO's breach of its lease with Coliseum.

As support for its contention that the trial court erred by piercing NiHFO's corporate veil, FSM argues that the trial court did not find evidence to support each of the Aronson factors. However, we have previously held that

> we do not need to address each factor individually because we hold that as a whole, the evidence supports the trial court's findings, and the findings support the judgment. The trial court, in its role as fact-finder, is the appropriate entity to resolve any conflicts in the evidence. Moreover, the *Aronson* factors are just that: non-exhaustive factors that may be considered in determining whether to pierce the corporate veil. There does not necessarily need to be evidence of every *Aronson* factor in order to support piercing the corporate veil.

*Fairfield Dev., Inc. v. Georgetown Woods Sr. Apartments Ltd. P'ship*, 768 N.E.2d 463, 471 (Ind.Ct.App.2002). Here, as in *Fairfield*, the evidence supports the trial court's findings and the findings support the judgment. Coliseum presented adequate evidence that FSM orchestrated the purchase agreement between FiSHFO and NiHFO to shield FiSHFO from liability related to the Coliseum lease.[6] Therefore, we cannot find that the trial court's decision to pierce NiHFO's corporate veil and hold FSM liable was erroneous.

### C. Damages

FSM argues that the trial court improperly awarded Coliseum $136,053.10 in damages. Specifically, FSM argues that FiSHFO's surrender of the Property barred Coliseum's recovery; therefore, the damages award is contrary to law.

---

**6.** FSM also argues that the trial court improperly pierced NiHFO's corporate veil because it found that FSM would not have been liable had FiSHFO not transferred its assets to NiHFO. However, had FSM not orchestrated the transfer of assets from FiSHFO to NiHFO, Coliseum would have had a remedy against FiSHFO—because FiSHFO would have been solvent. However, FSM *did* orchestrate the fraudulent transfer of assets from FiSHFO to NiHFO, and the rationale behind piercing the corporate veil is to protect innocent third parties from fraud or injustice. *Aronson*, 644 N.E.2d at 867. Therefore, FSM's argument is unpersuasive.

In a breach of contract case, the measure of damages is the loss actually suffered by the breach. *Sheppard v. Stanich,* 749 N.E.2d 609, 611 (Ind.Ct.App. 2001). However, the non-breaching party is not entitled to be placed in a better position than he would have been if the contract had not been broken. *Id.* at 612. Indeed, the non-breaching party, as a general rule, must mitigate his damages, and the breaching party has the burden to prove that the non-breaching party has not used reasonable diligence to mitigate its damages. *Ind. Indus., Inc. v. Wedge Prod., Inc.,* 430 N.E.2d 419, 428 (Ind.Ct. App.1982). Where a party does mitigate its damages, the breaching party is entitled to set off the amount of damages mitigated. *Id.*

Our review of a damages award is limited. *Whitaker v. Brunner,* 814 N.E.2d 288, 296 (Ind.Ct.App.2004). We do not reweigh the evidence or judge the credibility of witnesses, and we will reverse an award only when it is not within the scope of the evidence before the finder of fact. *Collections, Inc. v. Wolfe,* 818 N.E.2d 14, 16 (Ind.Ct.App.2004). However, "[t]he damage award cannot be based on speculation, conjecture, or surmise, and must be supported by probative evidence." *Whitaker,* 814 N.E.2d at 296.

FSM first argues that Coliseum was not entitled to damages because FiSHFO's surrender on August 31, 2002, ended FiSHFO's liability as a matter of law. While we have already concluded that the parties' lease did not bar Coliseum from seeking damages, FSM directs us to *Grueninger Travel Serv. of Fort Wayne, IN, Inc. v. Lake County Trust Co.,* which held:

> If a lessee abandons the leased estate and the lessor resumes possession, this conduct is generally held to have worked a surrender by operation of law because possession by the lessor for its own purpose is inconsistent with the continuance of the lease, unless the lease contains a provision preserving the lessee's liability for future rent under such circumstances.

413 N.E.2d 1034, 1045 (Ind.Ct.App.1980). Because the parties' lease did not expressly preserve FiSHFO's liability for future rent, FSM argues that *Grueninger* bars Coliseum's 17 recovery.

However, "[a]s a general rule, a tenant is liable for all rent remaining under a lease after the tenant vacates the property." *Marshall v. Hatfield,* 631 N.E.2d 490, 492 (Ind.Ct.App.1994). Furthermore, *Grueninger* also provides that surrender requires assent by both parties and does not occur simply because a tenant vacates the property:

> An express surrender is an agreement by the parties, which is usually required to be in writing and must be supported by consideration. A surrender will arise by operation of law when the parties to a lease do some act so inconsistent with the subsisting relation of landlord and tenant as to imply they have both agreed to consider the surrender as effectual. Thus, a surrender cannot be effected by the actions of only one party; therefore, a *surrender may not be forced upon a landlord by the unilateral actions of the tenant. To constitute a surrender by operation of law, there must be some decisive, unequivocal act by the landlord which manifests the lessor's acceptance of the surrender.* The resolution of whether there has been such a surrender and acceptance will be determined on a case by case basis by examining the acts of the respective parties in each case.

413 N.E.2d at 1039 (emphasis added). In determining whether a landlord has accepted the surrender of a lease and re-

leased the tenant from liability, the court must examine the acts of the parties. *Boonville Convalescent Ctr., Inc. v. Cloverleaf Healthcare Servs., Inc.*, 790 N.E.2d 549, 555 (Ind.Ct.App.2003). Whether there is a surrender and an acceptance thereof is a question for the trier of fact. *Grueninger*, 413 N.E.2d at 1038.

Coliseum argues that while FiSHFO may have vacated the Property, Coliseum did not *accept* its surrender; thus, FiSHFO was still liable for damages. While both parties agree that FiSHFO vacated the Property on August 31, 2002, the only evidence of Coliseum's acceptance is that "Coliseum thereafter retook possession of the [Property] and relet the premises." Appellant's Br. p. 17.

The evidence presented at trial shows that after FiSHFO vacated the Property, Coliseum "had to get it cleaned up in order to get it re-leased" because it was "trashed bad." Tr. p. 92. Coliseum made extensive repairs to the building's roof, parking lot, windows, doors, and electrical lighting before it relet the Property to Platinum Homes (Platinum) in February 2003. *Id.* at 93, 98–99, 113, 122–24, 213–14; Ex. 5. Coliseum collected between $1,500 and $4,000 per month from Platinum[7] until March 2005. Tr. p. 122–24; Ex. 5. The Property was vacant until August 2005 when Coliseum again relet it to another tenant for $4,000 per month. Ex. 5.

▇▇▇ The trial court's judgment in favor of Coliseum was, in effect, a finding that FiSHFO did not meet its burden of proving that Coliseum accepted its surrender. *Grueninger*, 413 N.E.2d at 1038. While FSM argues on appeal that Coliseum accepted FiSHFO's surrender when it relet the Property to Platinum, a landlord's re-

letting of the premises will not necessarily constitute an acceptance of surrender. *See, e.g., Boonville*, 790 N.E.2d at 556 (holding that landlord's continued operation of nursing home did not release tenant from liability where landlord had expressly told tenant that continued operation did not affect "any and all rights and claims under existing lease"); *Grueninger*, 413 N.E.2d at 1041 (finding tenant still liable after landlord relet property because parties' contract explicitly authorized landlord to relet without effectuating a termination of tenant's liability).

▇▇▇ FSM fails to direct us to an unequivocal act by Coliseum that demonstrated its acceptance of FiSHFO's surrender of the Property. In fact, Coliseum filed its complaint against FiSHFO on October 17, 2002—less than three weeks after FiSHFO vacated the Property. In its complaint, Coliseum sought damages "in the amount of all rent due and owing under the Lease, the costs of maintenance to the Property, the costs of restoring the Property to its Original Condition. . . ." Appellant's App. p. 67. Therefore, Coliseum's prompt complaint gave FiSHFO notice that Coliseum was not accepting its surrender of the Property. Because FSM does not direct us to an explicit act manifesting Coliseum's acceptance of FiSHFO's surrender, we cannot say that the trial court erred by awarding Coliseum damages.

Turning to the amount of damages, FSM argues that the trial court's $136,053.10 judgment against it results in a "windfall judgment against FSM." Appellant's Br. p. 18. As support, FSM relies heavily on its arguments that the lease did not provide for damages and the trial court should not have pierced NiHFO's

---

7. Platinum filed for bankruptcy in February 2004 and First Federal Bank of Wabash paid a portion of the rent after that date.

corporate veil to reach FSM's assets. Because we have already rejected those arguments, we will only reverse the damages award if it is not within the scope of the evidence before the finder of fact. *Collections*, 818 N.E.2d at 16.

At trial, Coliseum submitted evidence that FiSHFO's breach resulted in $214,722.74 of damages, including rent, insurance, taxes, utilities, and various repairs necessary to relet the Property.[8] Ex. 5–6, 8–25, 29–37. After reviewing the evidence, the trial court found that, as a result of the breach, FiSHFO was liable for $101,000 in rent, $51,201.27 in repairs, taxes, insurance, and utilities, and $20,558.41 in attorney's fees.[9] Appellant's App. p. 39–40, 48. Therefore, the trial court assessed damages against FiSHFO and NiHFO, jointly and severally, in the amount of $172,759.68, which those parties do not appeal.

■ The trial court also found that "[FSM], as the sole shareholder of [FiSHFO] should [be] liable for the debt of [FiSHFO] to Coliseum in an amount no greater than the value of the assets of [FiSHFO] existing as of August 31, 2002." *Id.* at 46. After hearing evidence regarding the value of FiSHFO's assets as of that date, the trial court issued an order providing that

> [t]he Court finds that it is very difficult to determine the value of the assets of the Defendant [FiSHFO] from the evidence that has been submitted. The best evidence of the value of the assets of the Defendant, [FiSHFO], is the amount of the consideration that the

Defendant, [NiHFO] agreed to pay to [FiSHFO] as established by the parties and contained in the provisions of the Asset Purchase Agreement dated August 31, 2002, in the amount of $136,053.10.

> WHEREFORE, the Court enters judgment in favor of Plaintiff [Coliseum] and against the Defendant, [FSM] in the sum of $136,053.10. Any sums received by the Plaintiff pursuant to this judgment shall also be credited against the judgment entered against the other Defendants on January 20, 2006 in the sum of $172,759.68. Costs to the Defendants. (Court to notify).

*Id.* at 49. It is important to note that although the trial court entered separate judgments against FiSHFO/NiHFO and FSM, Coliseum's total damages award totals $172,759.68 because any payments Coliseum receives from FSM, up to $136,053.10, will be credited against the $172,579.68 judgment entered against FiSHFO and NiHFO.

After reviewing the record, we conclude that the evidence presented to the trial court supports the damages award. Exs. 5–6, 8–25, 29–37; Appellant's App. p. 38–40. While the trial court opined that it was "very difficult" to assess the value of FiSHFO's assets on the date of transfer, appellant's app. p. 49, it based its judgment on the best evidence available—the asset purchase agreement between FiSHFO and NiHFO, which FSM orchestrated. Therefore, we cannot conclude that the

---

**8.** This figure properly takes into account Coliseum's mitigation of the damages—i.e., the rent that the subsequent tenants paid when Coliseum relet the Property. *Sheppard*, 749 N.E.2d at 612.

**9.** The trial court found that Coliseum could not collect damages for (1) roof repairs made

after FiSHFO vacated the Property because the repairs constituted a capital improvement, (2) interior and exterior capital improvements made in 2004, or (3) utility bills incurred after Coliseum relet the Property in February 2003. Appellant's App. p. 38–40.

trial court's damage award against FSM was unsupported by evidence.

### III. Cross–Appeal

Coliseum cross-appeals the trial court's finding that FSM was not a debtor pursuant to the UFTA. Specifically, Coliseum requests that we remand this case to the trial court to enter judgment against FSM "equal to the entire amount of Coliseum's damages."[10] Appellee's Br. p. 33.

In the section entitled "Transfers fraudulent as to present and future creditors," the UFTA provides, in relevant part, that

[a] transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation ... with actual intent to hinder, delay, or defraud any creditor of the debtor....

I.C. § 32–18–2–14. The UFTA defines a "debtor" as "a person who is liable on a claim." I.C. § 32–18–2–6. The UFTA provides various remedies for a successful party:

(a) In an action for relief against a transfer or an obligation under this chapter, a creditor, subject to the limitations in section 18 of this chapter, may obtain any of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim.

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by IC 34–25–2–1 or any other applicable statute providing for attachment or other provisional remedy against debtors generally.

(1) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure, any of the following:

(A) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred, its proceeds, or of other property.

(B) Appointment of a receiver to take charge of the asset transferred or of the property of the transferee.

(C) Any other relief the circumstances require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court orders, may levy execution on the asset transferred or its proceeds.

I.C. § 32–18–2–17.

At trial, Coliseum argued that FSM was liable pursuant to the UFTA. The trial court found that

77. The Court determines that the sale of the assets of [FiSHFO] to [NiHFO] on August 31, 2002, was a fraudulent transfer as defined by I.C. 32–18–2–14 in that the transfer of the assets was made with the intent to hinder, delay or defraud Coliseum.

78. The Court determines that the sale of assets of [FiSHFO] to [NiHFO] on August 31, 2002, was a fraudulent transfer as defined by I.C. 32–18–2–15, in that [FiSHFO] became insolvent as a result of the transfer.

79. With regards to Coliseum's claim that [FSM] violated I.C. 32–18–2 *et. seq.*, the Uniform Fraudulent Transfer Act,

---

**10.** Coliseum does *not* challenge the amount of the trial court's damages award; instead, it seeks a judgment against FSM for $172,- 759.68—the total amount of damages for which the trial court found FiSHFO/NiHFO jointly and severally liable.

the Court determines that as of August 31, 2002, the date of the transfer of the assets from [FiSHFO] to [NiHFO], [FSM] was not a "debtor" as that term is defined by I.C. 32–18–2–6 because [FSM] was not liable on the claim of Coliseum against [FiSHFO]. Therefore, [FSM] is not liable to Coliseum pursuant to the provisions of the Uniform Fraudulent Transfers [sic] Act.

Appellant's App. p. 46.

■ Coliseum argues that FSM was a debtor pursuant to the UFTA because the transfers it orchestrated between FiSHFO and NiHFO resulted in FSM's liability to Coliseum. After analyzing the statutory provisions at issue, we agree with Coliseum that the trial court erroneously concluded that FSM was not a debtor pursuant to Indiana Code section 32–18–2–6. There is a logical disconnect between the trial court's decision that FSM *is* liable to Coliseum for its role in the fraudulent asset transfer but *is not* a debtor to Coliseum. In other words, because FSM is liable to Coliseum for its fraudulent actions—a determination that we have upheld—FSM is necessarily a debtor as defined by the UFTA. I.C. § 32–18–2–6 (providing that a "debtor" is "a person who is liable on a claim"). The trial court's decision to the contrary was erroneous.

However, the remedies provisions of the UFTA focus on the *amount* of the fraudulent transfer. Section 32–18–2–17 provides that a creditor may avoid the transfer to the extent necessary to satisfy its claim, obtain an attachment or other provisional remedy against the transferred asset, or have a receiver appointed to "take charge of the asset transferred or of the property of the transferee." Here, the trial court awarded Coliseum damages against FSM in the amount of $136,053.10–the amount of assets that FSM fraudulent-

ly transferred from FiSHFO to NiHFO. The damages award that the trial court entered against FSM complies with the UFTA; thus, Coliseum's argument fails.

The judgment of the trial court is affirmed.

FRIEDLANDER, J., and CRONE, J., concur.