## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 17 2017, 5:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Michael C. Cooley
Eric N. Allen
Allen Wellman McNew Harvey, LLP
Greenfield, Indiana

ATTORNEY FOR APPELLEE

Reynold T. Berry
Rubin & Levin, P.C.
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

DSA Property, LLC,

*Appellant-Defendant-Counterclaimant,*

and,

HJA Property, LLC,

*Appellant-Counterclaimant,*

*v.*

Old National Bank,

*Appellee-Plaintiff-Counterdefendant.*

August 17, 2017

Court of Appeals Case No.
41A01-1610-PL-2252

Appeal from the Johnson Superior Court

The Honorable K. Mark Loyd, Special Judge

Trial Court Cause No.
41D01-1110-PL-83

**Barnes, Judge.**

# Case Summary

DSA Property, LLC, ("DSA") and HJA Property, LLC, ("HJA") appeal the trial court's grant of summary judgment to Old National Bank ("Bank") on the Bank's complaint and DSA and HJA's counterclaim. We affirm in part, reverse in part, and remand.

# Issue

DSA and HJA raise two issues, which we consolidate and restate as whether the trial court properly found that DSA and HJA were not entitled to funds that had been assigned to the Bank.

# Facts

Daniel Alyea and Sandra Alyea owned 9.015 acres in Greenwood, and H. Joan Alyea owned another 9.015 acres in Greenwood. In March 2003, the Alyeas entered into a Development Agreement with Wilderness Development, Inc. ("Wilderness") to sell the properties as lots in a commercial development. Under the Development Agreement, Wilderness agreed to provide development services and supervision of the development project in exchange for fifty-percent of the proceeds from the sale of lots on the property. The Development Agreement provided in part:

> Wilderness shall be solely responsible for the development of the Real Estate with all expenses and development costs being the sole responsibility of Wilderness. Wilderness agrees to indemnify and hold Alyea harmless for the payment of any real estate development expenses, including attorney fees, which are

the responsibility of Wilderness under this Agreement. Wilderness agrees not to permit any Mechanic's Liens to be filed against the Real Estate and, if any are filed, agrees to promptly resolve any dispute which resulted in the creation of the Lien. Wilderness further agrees to indemnify and hold Alyea harmless from the payment of any Mortgage Lien debt or any other debts which Wilderness may incur associated with the development of the Real Estate. Wilderness agrees to indemnify Alyea from any expenses that may be incurred as a result of the filing of any Liens against the Real Estate due to transactions of Wilderness.

Appellants' App. Vol. II p. 54-55. The Development Agreement also provided:

Wilderness will be required to incur debt to finance its operations for the development of the Real Estate, including but not limited to subdivision, infrastructure, zoning, and government approvals, and other improvements required to develop the Wilderness. No portion of this Agreement shall be interpreted so as to require Alyea to incur any personal liability on the debt so incurred. The real estate of J. Alyea, however, as indicated above, will be used as collateral to support the financing of the development. J. Alyea agrees, as required by Wilderness's mortgage lender, to subordinate her interest and in the use of the Real Estate as collateral for the debt incurred by Wilderness for the purpose of development, as contemplated herein. Repayment of any mortgage debt incurred by Wilderness shall be pursuant to the terms of the applicable debt instruments, but the subordination and use of the Real Estate as collateral shall be maintained until the mortgage debt is paid in full.

* * * * *

All development expenses . . . are the sole responsibility of Wilderness and shall be paid by Wilderness out of Wilderness' one-half of the gross proceeds without any reimbursement from

Alyea. All expenses, debts and Mechanic's Liens incurred by the developer in improving the Real Estate shall be paid from Wilderness's portion of the sale proceeds. . . . Wilderness will be entitled to receive a development fee of 50% of the gross sale price of each tract, after sales expenses . . . . All expenses, debts and Mechanic's Liens incurred by the developer in improving the Real Estate shall be paid from Wilderness's portion of the sales proceeds.

Each party shall bear its own expenses incurred in the negotiation of or preparation of this Agreement, the formation of any limited liability companies or corporations, or any similar expenses incurred in the ongoing operation of the development.

*Id.* at 55-56. Daniel Alyea and Sandra Alyea later assigned their interests in the Development Agreement to DSA, and H. Joan Alyea transferred her interest in the Development Agreement to HJA.

[4] In May 2007, Wilderness executed a promissory note with an original principal balance of over $1,400,000.00 in favor of the Bank.[1] Pursuant to the Development Agreement, to secure the note, HJA executed a mortgage on its real estate. Additionally, Wilderness executed an "Additional Obligations Under and Assignment of Rights Under Development Agreement and Interests in Purchase Agreements" ("Assignment"). *Id.* at 39. The Assignment provided: "[Wilderness] hereby assigns and transfers over to [Bank], its successors and assigns, all of its right, title and interest in and to any payments,

---

[1] The note was issued by Indiana Bank and Trust Company, which was acquired by the Bank in September 2012.

proceeds or compensation to be paid under the Development Agreement . . . and the rights to receive payments under purchase agreements . . . ." *Id.* In the event of a default by Wilderness on the note, the Bank had "the right to possess and use and the right to enforce and enjoy the benefits of the Development Agreement and Purchaser Contracts" and "full power and authority to request, demand, collect, receive and receipt for performance under the Development Agreement and any proceeds thereof . . . ." *Id.* Additionally, DSA and HJA executed a consent ("Consent Agreement") that provided: "The undersigned, as the Sellers, and the parties to whom the Premises has been transferred hereby consent to the foregoing Assignment and acknowledge the rights of [the Bank] in and to the proceeds from the sale of the Premises." *Id.* at 48.

[5] Wilderness failed to pay the note and, in May 2010, the Bank filed a complaint for money judgment and foreclosure against Wilderness and HJA. In October 2011, the trial court entered judgment in favor of the Bank and foreclosed the HJA property. However, after the foreclosure of the property, the Bank is still owed more than $500,000.

[6] In October 2011, the Bank filed a complaint against DSA. The Bank alleged that it was entitled to receive Wilderness's fifty-percent of the proceeds of the sale of the remaining DSA real estate. The Bank sought a declaratory judgment, including a judgment that the "Assignment is enforceable against DSA and DSA must render performance under the Assignment in favor of [the Bank] as if [the Bank] were Wilderness until the debt owed by Wilderness to [the Bank] is paid in full." *Id.* at 27.

DSA filed an answer to the complaint, and DSA and HJA filed a counterclaim against the Bank. In the counterclaim, DSA and HJA contended that the Development Agreement was void and/or voidable because Wilderness had breached the agreement. They also alleged that they had "incurred substantial damages by reason of the default" and that they were entitled to "[a] judgment for setoff against [the Bank] for any amounts that DSA might owe to [the Bank] in the future." *Id.* at 65. In 2013, DSA acquired HJA and its claim for damages against Wilderness.

The Bank filed a motion for summary judgment on its complaint and on the counterclaim.[2] The Bank argued that, under Indiana Code Section 26-1-9.1-404,[3] it could not be held liable to DSA or HJA for Wilderness's breach. The

---

[2] In 2009, Wilderness sold to DSA its interest in one-half of the proceeds from the sale of Lot 10. The parties stipulated that DSA owned Lot 10 "free and clear" of any claim by the Bank and that "DSA may retain 100% of the proceeds from DSA's sale of 'Lot 10.'" Appellants' App. Vol. II p. 178. The Bank makes no claim to any proceeds from the sale of Lot 10.

[3] Indiana Code Section 26-1-9.1-404 is part of the Uniform Commercial Code and addresses rights acquired by an assignee and claims and defenses against an assignee. It provides:

(a)      Unless an account debtor has made an enforceable agreement not to assert defenses or claims, and subject to subsections (b) through (e), the rights of an assignee are subject to:

    (1)      all terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

    (2)      any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

(b)      Subject to subsection (c) and except as otherwise provided in subsection (d), the claim of an account debtor against an assignor may be asserted against an assignee under subsection (a) only to reduce the amount the account debtor owes.

Bank also argued that DSA had consented to Wilderness's assignment to the Bank, that the Bank was entitled to Wilderness's fifty-percent share of the proceeds, and that DSA was not damaged by Wilderness's breach. The parties stipulated that Wilderness's only breach of the Development Agreement was its failure to pay its loan from the Bank.

[9] In response, DSA and HJA argued that Wilderness's default on the note was a breach of the Development Agreement. They argued that the Bank was only entitled to proceeds to which Wilderness would be entitled to receive and that "if Wilderness is not entitled to receive any proceeds from the sale of the DSA real estate pursuant to the terms of the Development Agreement (and Wilderness's breach thereof), then neither is [the Bank]." *Id.* at 154. DSA alleged that it "incurred legal costs and attorney fees as a direct result of Wilderness's breach" and that HJA "incurred both legal costs and attorney fees, and the loss of its investment and real estate as a direct result of Wilderness's breach of the Development Agreement." *Id.* at 155. According to DSA and

---

(c)     This section is subject to law other than IC 26-1-9.1 that establishes a different rule for an account debtor who is an individual and who incurred the obligation primarily for personal, family, or household purposes.

(d)     In a consumer transaction, if a record evidences the account debtor's obligation, law other than IC 26-1-9.1 requires that the record include a statement to the effect that the account debtor's recovery against an assignee with respect to claims and defenses against the assignor may not exceed amounts paid by the account debtor under the record, and the record does not include such a statement, the extent to which a claim of an account debtor against the assignor may be asserted against an assignee is determined as if the record included such a statement.

(e)     This section does not apply to an assignment of a health-care-insurance receivable.

HJA, they are entitled to an "appropriate amount of Wilderness's portion of the sale proceeds . . . to compensate them for the damages caused and debts incurred by Wilderness." *Id.* DSA and HJA argued that, pursuant to their counterclaim, their damages are recoverable in the "form of set off against any sums . . . owed to Wilderness under the Development Agreement." *Id.* at 158.

[10] After a hearing, the trial court granted the Bank's motion for summary judgment regarding its complaint and the counterclaim. The trial court found:

> There is no genuine dispute that Old National is entitled to proceeds from the sale of the subject realty which would be owing to Wilderness. However, the Defendants argue that a portion owning to Wilderness is subject to their indemnity claims for their alleged damages arising from the mortgage foreclosure.

*Id.* at 13. The trial court concluded that, under Indiana Code Section 26-1-9.1-404, "as an assignee of Wilderness, Old National is not obligated to DSA and HJA for the amount of damages owed to them by Wilderness." *Id.* at 15. The trial court determined that "Old National is entitled to the amounts due Wilderness under the Development Agreement, which are fifty percent (50%) of the Net Sale Proceeds from the sale of the subject realty owed by DSA after deducting sales expenses, as defined by the Development Agreement." *Id.* DSA filed a motion to correct error arguing that the trial court misinterpreted Indiana Code Section 26-1-9.1-404, and the trial court denied the motion to correct error. DSA and HJA now appeal.

# Analysis

[11] DSA and HJA challenge the trial court's grant of summary judgment to the Bank on the Bank's complaint and on DSA's and HJA's counterclaim. Summary judgment is appropriate only when the moving party shows there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. *Schoettmer v. Wright*, 992 N.E.2d 702, 705 (Ind. 2013); *see also* Ind. Trial Rule 56(C). Once that showing is made, the burden shifts to the non-moving party to rebut. *Schoettmer*, 992 N.E.2d at 705-06. When ruling on the motion, the trial court construes all evidence and resolves all doubts in favor of the non-moving party. *Id.* at 706. We review the trial court's grant of summary judgment de novo, and we take "care to ensure that no party is denied his day in court." *Id.*

[12] This litigation concerns the Bank's right to receive Wilderness's fifty-percent of the proceeds of lot sales from DSA's portion of the development. The Bank is not claiming that it is entitled to any of DSA's portion of the lot sale proceeds. Rather, DSA and HJA are claiming that they are entitled to at least a portion of Wilderness's fifty-percent, which was assigned to the Bank, because, as a result of Wilderness's default on the note, DSA and HJA incurred attorney fees and HJA lost its property. Resolution of this issue requires that we interpret the Development Agreement, the Assignment, and the Consent Agreement.

[13] "'The construction of a written contract is a pure question of law.'" *The Winterton, LLC v. Winterton Inv'rs, LLC*, 900 N.E.2d 754, 759 (Ind. Ct. App.

2009) (quoting *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007)), *trans. denied*. Our duty is to interpret a contract to ascertain the intent of the parties. *Id.* "When interpreting a contract, we attempt to determine the intent of the parties at the time the contract was made by examining the language used in the instrument to express their rights and duties." *Id.* Where the language of the contract is unambiguous, we determine the parties' intent from the four corners of the document. *Id.* The unambiguous language of a contract is conclusive upon the parties to the contract as well as upon the court. *Id.* We will neither construe unambiguous provisions nor add provisions not agreed upon by the parties. *Id.*

[14] A contract is ambiguous when a reasonable person could find its terms susceptible to more than one interpretation. *Id.* If a contract is ambiguous, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder. *Id.* When trying to ascertain the intent of the parties, we will read the contract as a whole. *Id.* Additionally, we will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* We must accept an interpretation of the contract that harmonizes its provisions rather than one that causes the provisions to conflict. *Id.*

[15] In its motion for summary judgment, the Bank argued that Wilderness had assigned its right to the fifty-percent of the proceeds to the Bank in the event of default, that DSA consented to the Assignment, that DSA was entitled to only fifty-percent of the proceeds under the Development Agreement, and that

Indiana Code Section 26-1-9.1-404 prevented DSA from asserting a claim against Wilderness's fifty-percent proceeds assigned to the Bank. DSA and HJA responded that, under the Development Agreement, they were entitled to compensation for their damages caused by Wilderness, that Indiana Code Section 26-1-9.1-404 was inapplicable, and that they were entitled to a set off from the fifty-percent proceeds assigned to the Bank.

[16] On appeal, DSA and HJA contend that they are entitled to compensation for legal costs and attorney fees sustained as a result of this litigation and "related to ancillary legal issues related to Wilderness's breach" and HJA's loss of its proceeds from lot sales by the foreclosure of its property. Appellants' App. Vol. II p. 170. We begin by noting that the Development Agreement specifically provided: "The real estate of [HJA] . . . will be used as collateral to support the financing of the development. [HJA] agrees, as required by Wilderness's mortgage lender, to subordinate her interest and in the use of the Real Estate as collateral for the debt incurred by Wilderness for the purpose of development, as contemplated herein." *Id.* at 55. HJA then entered into a mortgage, which was later foreclosed. HJA knowingly used its property as collateral in developing the property and subordinated its interest to the Bank. HJA cannot now try to recover its lost investment from the Bank by claiming funds that were also assigned to the Bank as collateral.

[17] Moreover, we note that, in support of their arguments, DSA and HJA rely on the following portions of the Development Agreement:

Wilderness further agrees to indemnify and hold [DSA and HJA] harmless from the payment of any Mortgage Lien debt or any other debts which Wilderness may incur associated with the development of the Real Estate. Wilderness agrees to indemnify [DSA and HJA] from any expenses that may be incurred as a result of the filing of any Liens against the Real Estate due to transactions of Wilderness.

*Id.* at 54-55. The first sentence relied upon by DSA and HJA pertains to Wilderness's agreement to indemnify DSA and HJA for debts "which Wilderness may incur." *Id.* at 55. DSA and HJA's attorney fees are debts incurred by DSA and HJA, not Wilderness, and the foreclosure of HJA's property is not a debt incurred by Wilderness. Consequently, the first sentence is inapplicable here. Even if we were to assume that the second sentence can be construed to require Wilderness to indemnify DSA and HJA for attorney fees and the foreclosure related to Wilderness's breach, we find the following portions of the Development Agreement relevant:

All development expenses . . . are the sole responsibility of Wilderness and shall be paid by Wilderness out of Wilderness' one-half of the gross proceeds without any reimbursement from Alyea. All expenses, debts and Mechanic's Liens incurred by the developer in improving the Real Estate shall be paid from Wilderness's portion of the sale proceeds. . . . Wilderness will be entitled to receive a development fee of 50% of the gross sale price of each tract, after sales expenses . . . . All expenses, debts and Mechanic's Liens incurred by the developer in improving the Real Estate shall be paid from Wilderness's portion of the sales proceeds.

> Each party shall bear its own expenses incurred in the negotiation of or preparation of this Agreement, the formation of any limited liability companies or corporations, or any similar expenses incurred in the ongoing operation of the development.

*Id.* at 55-56. This provision requires that expenses *incurred by Wilderness* will be paid out of its fifty-percent of the proceeds. Nothing in this provision allows attorney fees incurred by DSA and HJA or the loss of HJA's property to be reimbursed from Wilderness's portion of the sale proceeds, which were assigned to the Bank.

[18] Finally, we note that DSA and HJA signed a Consent Agreement that provided: "The undersigned, as the Sellers, and the parties to whom the Premises has been transferred hereby consent to the foregoing Assignment and acknowledge the rights of [the Bank] in and to the proceeds from the sale of the Premises." *Id.* at 48. As with the Development Agreement, nothing in the Consent Agreement allowed DSA and HJA to withhold monies from Wilderness's fifty-percent of the proceeds, which was assigned to the Bank. If DSA and HJA wanted to be paid the funds indemnified by Wilderness through the fifty-percent proceeds, they could have included such a provision in the Development Agreement and negotiated such a provision with the Bank in the Assignment and Consent Agreement. However, they did not do so, and we will not rewrite their agreements to include such provisions.

[19] Because the Agreements did not allow DSA and HJA to claim Wilderness's portion of the fifty-percent proceeds as reimbursement for their alleged

indemnity damages, we need not address the parties' arguments regarding Indiana Code Section 26-1-9.1-404.[4] The trial court properly granted the Bank's motion for summary judgment on its claim and on the counterclaim filed by DSA and HJA.

[20] The Bank, however, points out the calculation of amounts still owed to the Bank by Wilderness is incorrect. See Appellee's Br. p. 8 n.4; Appellant's App. Vol. II p. 12. The Bank notes that it "may be proper to remand solely for the purpose of correcting the total contained in ¶2(W) of the trial court's August 3, 2016 Order granting [the Bank's] Summary Judgment Motion and to determine additional fees incurred by [the Bank] since that entry." Appellee's Br. p. 8 n.4. Consequently, although we affirm the trial court's grant of summary judgment to the Bank in all other respects, we reverse and remand for a recalculation of the amount owed to the Bank.

## Conclusion

[21] The trial court properly granted the Bank's motion for summary judgment, but we reverse and remand for a recalculation of the amount owed to the Bank. We affirm in part, reverse in part, and remand with instructions.

---

[4] To the extent that DSA and HJA argue recoupment, we conclude that this issue is waived. DSA and HJA did not raise recoupment until they filed their Appellant's Brief. *Troxel v. Troxel*, 737 N.E.2d 745, 752 (Ind. 2000) ("A party may not raise an issue for the first time in a motion to correct error or on appeal.").

Affirmed in part, reversed in part, and remanded.

Baker, J., and Crone, J., concur.