# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 13 2016, 8:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Gerald B. Coleman
Richard P. Nover
Coleman Stevenson, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEES

Scott M. Penny[1]
Carmel, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Star Property Solutions, LLC
and Indy Drains, LLC,

*Appellants/Cross-Appellees-Defendants/Counterclaimants*,

v.

Pine Financial, LLC,

*Appellee/Cross-Appellant-Plaintiff/Counterclaim Defendant*,

July 13, 2016

Court of Appeals Case No.
49A05-1505-CC-412[2]

Appeal from the
Marion Superior Court

The Honorable
John F. Hanley, Judge

Trial Court Cause No.
49D11-1302-CC-5482

---

[1] Scott M. Penny, who served as Appellees' attorney at the time their brief was filed, withdrew as counsel on March 3, 2016. Since that time, no attorney has filed an appearance for the Appellees.

[2] We note that, initially, both parties filed a notice of appeal regarding this judgment, each filing under a separate appellate case number. However, we ultimately consolidated the two cases into Case No. 49A05-1505-CC-412.

and

T. Tad Bohlsen,

*Appellee/Cross-Appellant-*

*Counterclaim Defendant*.

**Kirsch, Judge.**

[1] Star Property Solutions, LLC ("Star") and Indy Drains, LLC ("Indy Drains") (together, "Tenants")[3] entered into a lease agreement ("the Lease") to rent a commercial building from Pine Financial, LLC ("Pine"). T. Tad Bohlsen ("Bohlsen), a manager and member of Pine, negotiated the terms of the Lease. Pine sued Tenants for breach of contract on the basis of non-payment of the rent. Tenants filed an amended counterclaim against Pine and Bohlsen (together, "Landlords"),[4] alleging breach of contract, replevin, constructive eviction, retaliatory eviction, conversion, and trespass. Following a bench trial, the trial court granted damages: (1) to Pine in the amount of $30,000.00, finding that Tenants had breached the terms of the Lease; and (2) to Tenants in

---

[3] As explained later, Star and Indy Drains were contractually bound to pay the rent—Star as the renter and Indy Drains as the guarantor. Therefore, unless more specificity is required, we refer to them together as Tenants.

[4] Because both Bohlsen and Pine are liable for any damages owed to Tenants, we refer to them together as Landlords.

the amount of $30,000.00, finding that Landlords had interfered with Tenants' business relationships. Tenants appeal, and Landlords cross-appeal, raising the following consolidated, restated, and reordered issues:

> I. Whether the $30,000.00 damages award entered in favor of Pine, for Tenants' breach of contract, is within the scope of the evidence; and

> II. Whether the $30,000.00 damages award entered in favor of Tenants, on their amended counterclaim against Landlords, is within the scope of the evidence.

We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

Landlords worked with investors to locate undervalued properties that could be purchased and resold at a higher price. The "basic investment approach" involved helping a property owner secure a renter; once the property established a positive cash flow, Landlords would approach investors, obtain funding, and purchase the property. *Tr.* at 14. Believing that a commercial building located on South State Street in Indianapolis ("the Building"), which was owned by Charles Norman Meurer ("Meurer"), was a viable undervalued property, Landlords offered to help Meurer secure renters.

In July or August 2012, Indy Drains' President David Godoy ("Godoy") and Vice President Tiberio Clemente approached Landlords, expressing interest in leasing the Building. Landlords then contacted Meurer, who agreed that Pine

would lease the Building from Meurer for $2,500.00 per month, and in turn, Pine would sublet it to Indy Drains for $2,500.00 per month. Accordingly, Pine entered into a lease agreement ("the Meurer Lease"), dated August 29, 2012, to lease the Building from Meurer, "as is," for a two-year term, commencing on October 1, 2012. *Pls.' Ex*. CC.

[5] Pine agreed to lease the building to Indy Drains for a three-year term, commencing September 1, 2012. *Appellants' App*. at 15-25. Bohlsen's assistant, George Bailey, attended the September 3, 2012 meeting at which the Lease was signed. Prior to execution, the Lease named Indy Drains as the tenant. However, Godoy, hoping to build up the credit of Star, a newly formed corporation, asked Bailey to change the Lease by removing Indy Drains and adding Star as the tenant. Bailey agreed, and Star signed the Lease. *Tr*. at 21. Later, when Bohlsen learned of the change, he required Indy Drains to serve as Star's guarantor. Tenants agreed and, on October 3, 2012, Indy Drains signed a Commercial Lease Guaranty.

[6] Under the Lease, Pine agreed to "keep and maintain in good repair and working order and make repairs to and perform maintenance upon": (a) structural elements of the Building; (b) mechanical (including HVAC), electrical service and below ground plumbing elements; (c) the roof of the Building; (d) exterior windows of the Building; and (e) all exterior lighting. *Appellants' App*. at 16. Pine also promised to make certain improvements and repairs ("Landlord Work"), which Pine itemized in the Lease as Exhibit A. Pine agreed to: (a) provide a gravel parking lot in back; (b) provide fencing around

the gravel parking lot; (c) replace worn or damaged carpeting throughout the Building; (d) repaint scuffed or damaged walls throughout the Building; (e) add a three-foot entrance door in the rear wall of the Building; and (f) address "other items TBD." *Id.* at 24. Pine agreed to complete the improvements "at its sole cost and expense" and within four weeks after receiving notice from Tenants to start the work. *Id*. at 16, 24. Under the Lease, Tenants' "sole recourse," in the event Pine failed to complete the Landlord Work as scheduled, was "a rent reduction of five hundred dollars" for each month the items were not completed. *Id*. at 16.

[7] After signing the Lease, Tenants gave Pine two checks, each in the amount of $2,500.00 (one for the September 2012 rent and the other for the security deposit). In exchange, Pine gave Tenants a key to the Building. When Tenants began to move in on September 4, 2012, they found the previous tenant's property, including furniture, electronics, and piles of television and computer monitors, still in the Building. *Tr*. at 155. Tenants complained to Pine that the Building was not as promised.

[8] Most of Tenants' communications with Pine were made through Bohlsen. On September 7, 2012, Tenants sent Bohlsen an email expressing their concern that none of the repairs were underway. *Appellants' App.* at 28. On October 2, 2012, Tenants sent Bohlsen a follow-up email explaining that the previous tenant's property was still in the Building, "there [were] roof leaks everywhere," the front office was covered in mold, the back office still had not been painted, the garage door openers were not working, the parking lot and fence had not been

completed, and there were exposed electrical wires and cracks in the walls through which light could be seen. *Id*. at 29. Tenants stated, "I am expecting a rent credit for this month [October 2012]. Due to the fact that everything you said would be completed has not been and WE STILL HAVE NOT MOVED OUR STUFF IN." *Id*. (emphasis in original).

[9] On October 5, 2012, Tenants removed some of the previous tenant's furniture, hauled away trash and debris, trimmed the trees, changed the lock on the door of the workshop, and repaired the "Electric Strike (Door Opener)." *Id*. at 31. That same day, Tenants submitted to Pine an invoice for the work, in the amount of $2,402.50, and sent an email to Bohlsen informing him that Tenants had removed some of the previous tenant's property. Tenants also asked Bohlsen when the prior tenant's television and computer monitors would be removed[5] and requested assurances "that [Pine] would be giving [Tenants] the rent credit that we discussed for not being able to move our stuff in and all the problems." *Id*. at 30. Three days later, Tenants sent another email to Bohlsen, stating that they had not heard from him and asking Bohlsen to let Tenants "know where we stand with the Rent Credit since today is the 8th." *Id*.

[10] Having received no correspondence from Bohlsen regarding a credit, Tenants did not pay the November or December rent. *Appellants' Br*. at 5 (citing *Tr*. at

---

[5] There were approximately 1,000 television and computer monitors still in the warehouse in early October 2012. Because these units contained mercury, it would have cost between $10 and $40 each to dispose of them properly. *Tr*. at 169.

214). The Landlord Work was completed on or about December 15, 2012. *Appellants' App*. at 33. On January 30, 2013, Pine sent a letter to Tenants informing them that they had ten days to cure the default, stating, "The final due date for this payment will be February 9th." *Id*. at 34-35. Pine advised Tenants that the "past due rent" was $10,000.00 for the months of October through January, plus late fees, notice fees, and all other fees charged under the Lease, including legal fees. *Id*. at 33-34. On February 7, 2013, Landlords sent Tenants a letter informing them that Landlords would be entering the premises on February 8, 2013 to conduct an inspection of the premises. *Appellees' App*. at 69.

[11] On February 8, 2013, one day prior to the deadline to cure, Bohlsen ordered two of Pine's employees ("the Employees") to enter the Building. Indianapolis Metropolitan Police Officer Randall Cook ("Officer Cook"), who was responding to a security alarm at the Building encountered the Employees around 10:45 a.m., and the Employees explained that they were inspecting the Building in connection with an eviction. *Tr*. at 142. Officer Cook inquired whether they had appropriate legal papers, and when he discovered that they did not, he advised the Employees to leave. While he was there, Officer Cook saw that the Building was still occupied and noticed there were vehicles parked inside the gated and locked fence behind the Building. *Id*. at 143-44. Around 3:30 in the afternoon of the same day, Officer Cook was again dispatched to the Building. There, he met Tenants, who reported that their vehicles and trailers were gone. Officer Cook's investigation revealed that the back fence had been

cut and three vans, three trailers, and Tenants' tools were all missing. *Id*. at 145-47. While at the scene, Officer Cook spoke on the phone to Bohlsen, who explained that he had removed Tenants' business property because they were behind on their rent. *Id*. at 146-47. Officer Cook advised Bohlsen that he should get a court order and evict Tenants in a lawful manner. *Id*. at 147.

[12] On February 12, 2013, Pine filed a complaint against Tenants, alleging that failure to pay the rent as required under the Lease constituted a breach of contract. At Landlords' request, the trial court entered a default judgment on April 15, 2013. Tenants filed a motion for relief from default judgment, which the trial court granted on October 3, 2013. In November 2013, Tenants filed their counterclaim against Landlords and filed a motion for replevin in March 2014.

[13] On September 4, 2014, Tenants were granted leave to amend their counterclaim. In the amended counterclaim ("Counterclaim"), Tenants raised claims of breach of contract, replevin, constructive eviction, retaliatory eviction, conversion, and trespass. Tenants also named Bohlsen as a party defendant, asking the trial court to pierce the corporate veil. Tenants claimed that, at the time the Lease was entered into, Pine, the entity that signed the lease, was, and continues to be, administratively dissolved; therefore, the Lease "is of no effect," and Bohlsen, the owner of Pine, was personally liable. *Appellants' App*. at 43. Although the trial court made no specific findings regarding the appropriateness of piercing the corporate veil, it found Bohlsen liable for damages, concluding, "Defendants/Counterclaimants are entitled to a

judgment against the *Counter-Defendants* on their Amended Counterclaim for Damages." *Id.* at 15 (emphasis added). The parties entered into, and the trial court approved, an Agreed Order of Possession on the Replevin Motion ("Agreed Order") on October 2, 2014; two months later, Tenants filed a motion to enforce the Agreed Order, which the trial court granted on January 7, 2015.[6]

[14] During the March 10, 2015 bench trial, Landlords introduced evidence of damages caused by Tenants' failure to pay the rent, and Tenants introduced evidence of damages caused by the illegal removal of Tenants' business property. Landlords admitted that they made no attempt to return Tenants' property. However, Landlords argue on appeal that they did not illegally remove the business property because, under the Lease, they had a right to enter the Building after providing Tenants with a written notice of default.

[15] While it is true that Landlords could inspect the premises during regular business hours and enter the building after providing Tenants with notice of default, neither of those provisions provided Landlords with the right to remove Tenants' property from the Building. *Tr.* at 129; *Appellant's App.* at 18. Further, the Lease contained no terms suggesting that Landlords had a lien against the business property securing Tenants' payment of the rent.

---

[6] The following documents are not in the record before us: Pine's complaint, the default judgment, Tenants' motion for relief from default judgment, Tenants' counterclaim and motion for replevin, the Agreed Order of Possession on the Replevin Motion, and the order enforcing the Agreed Order.

[16] In its April 24, 2015 Order, the trial court made the following findings. First, "The parties entered into a lease agreement on August 30, 2012 for a period of three (3) years," which called for a monthly rent payment of $2,500.00. *Appellants' App.* at 12. Tenants made one rent payment. Pine mitigated potential damages by re-leasing the property in September 2013. *Id.*; *Tr.* at 92. Accordingly, Tenants were indebted to Pine for one year's rent, *i.e.*, $30,000.00. *Appellants' App.* at 12-13. Second, Landlords entered into Tenants' business premises, which was the subject of the Lease and, without permission, removed Tenants' vehicles, trailers, and tools. *Id.* at 13. As a result of "engaging in this apparent attempt at self-help," Landlords interfered with Tenants' business relationships with customers, resulting "in a loss of business and an attendant loss of revenue." *Id.* Without explaining either the claim upon which it was granting the damages or the basis for the calculation, the trial court concluded that Tenants incurred damages in the amount of $30,000.00. *Id.* Third, the trial court found Landlords were in contempt of the Agreed Order. The trial court ordered Landlords to return Tenants' business property within ten days of the Order.[7]

[17] Tenants appeal, and Landlords cross-appeal the damages awards. Specific facts pertaining to the evidence of damages will be added where appropriate.

---

[7] There is no evidence in the record before us regarding whether Tenants' property was ever returned.

# Discussion and Decision

## I. Damages Awarded to Pine

[18] Tenants do not appeal the trial court's conclusion that they breached the Lease by failing to pay rent. Instead, Tenants maintain that the $30,000.00 damages award entered against them and in favor of Pine is not within the scope of the evidence. Pine contends that its $30,000.00 award of damages for Tenants' breach of contract was within the evidence. Noting that the trial court set forth its method for calculating the damages, Pine maintains that the award was not based on "conjecture and speculation," and therefore, should not be disturbed. *Sheek v. Mark A. Morin Logging, Inc.*, 993 N.E.2d 280, 287 (Ind. Ct. App. 2013).

[19] Generally, the computation of damages for a breach of contract is a matter within the sound discretion of the trial court. *City of Jeffersonville v. Envtl. Mgmt. Corp.*, 954 N.E.2d 1000, 1015 (Ind. Ct. App. 2011). We will not reverse a damage award upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* In determining whether an award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.* A factfinder may not award damages on the mere basis of conjecture and speculation. *Sheek*, 993 N.E.2d at 287 (citing *Indianapolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1024 (Ind. Ct. App. 2009)), *trans. denied.* Instead, the award must be supported by probative evidence. *Id.* (citing *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007). "Accordingly, a damage award must reference some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of

use, loss of profits, or direct inference from known circumstances." *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 337 (Ind. Ct. App. 2011) (quoting *Coffman v. Olson & Co., P.C.*, 906 N.E.2d 201, 210 (Ind. Ct. App. 2009), *trans. denied*). In a breach of contract action, the measure of damages is the loss actually suffered by the breach. *Sisters of St. Francis Health Servs., Inc. v. EON Props., LLC*, 968 N.E.2d 305, 313 (Ind. Ct. App. 2012). That said, the non-breaching party is not entitled to be placed in a better position than it would have been if the contract had not been broken. *Id.*

[20]     Here, the trial court calculated the $30,000.00 damages award for Tenants' breach of contract claim by multiplying Tenants' monthly rent of $2,500.00 by twelve months, presumably the period from September 1, 2012 through August 30, 2013 (because the Building was re-rented by September 2013).[8] *Tr.* at 92. Tenants argue that the evidence does not support the $30,000.00 award because the calculation of damages, based, as the trial court determined, on one year of rent, should have been reduced by credits: (1) for Tenants' payments of the September 2012 rent and the security deposit; (2) to compensate Tenants for Pine's untimely completion of the Landlord Work; and (3) to reimburse Tenants for repairs they performed on the Building.

---

[8] Bohlsen testified that: Pine "had a signed lease with somebody else who defaulted in the summer of 2013"; and subsequent lease agreements resulted in a shortfall of rent because the Building was rented for less than $2,5000.00 per month *Tr.* at 93. In calculating damages, the trial court chose not to consider whether Tenants were liable for less than twelve months rent, due to a subsequent renter's default, nor did it consider whether shortfalls in rent resulted in additional damages to Pine.

[21] At the commencement of the Lease, Tenants paid Landlords $2,500.00 for the September 2012 rent, which Pine applied to that month's rent. Tenants also paid Pine $2,500.00 for a security deposit. The Lease provided that the security "deposit shall be returned to Tenant[s], without interest, and less any set off for damages to the premises upon termination of this Lease, any unpaid rents, or any other fees incurred by the Landlord in conjunction with Tenant[s]' possession of the Premises." *Appellants' App.* at 15. The Lease clearly contemplated that the security deposit could be used as a credit against unpaid rents. The trial court's $30,000.00 damage award is not supported by the evidence because the trial court's judgment did not apply a credit for the September rent and a credit for some or all of the $2,500.00 security deposit.

[22] Tenants moved into the Building on September 4, 2012. The Lease required Pine to complete Landlord Work within four weeks of receiving notice from Tenants and provided that Tenants would be given rent credit in the amount of $500.00 for each month that the Landlord Work remained incomplete. *Appellants' App.* at 16. Tenants notified Pine in a September 7, 2012 email that it was waiting for Pine to commence the Landlord Work.[9] *Id*. at 28. Pine

---

[9] Bohlsen testified during trial that he did not believe Pine had a legal obligation to perform Landlord Work on the Building until Indy Drains executed the Lease Guaranty on October 3, 2012. *Tr*. at 100. Pine, therefore, contends that the thirty-day time limit for completing Landlord Work could not have commenced until October 3, 2012. We disagree. Here, the Lease contained no provision suggesting that the time frame for commencement of the Landlord Work would or could be delayed until Indy Drains signed the Lease Guaranty. Further, as early as September 7, 2012, Tenants sent an email to Bohlsen informing Pine that Tenants would be willing to sign a new lease under the name Indy Drains and requested that Star be added to any new lease. *Appellees' App*. at 28.

admitted that the Landlord Work was not completed until around December 15, 2012. *Id*. at 33. Accordingly, Tenants should have received at least some credit against the rent.[10] Further, by affidavit, Bohlsen testified that Pine had agreed to waive Tenants' October 2012 rent and deduct $500.00 from the November rent and $300.00 from the December rent. *Id*. The trial court's damages award was not supported by the evidence because the trial court's judgment does not reflect the credits that, by contract and by Pine's own admission, were owed to Tenants for the delay in completing the Landlord Work

[23] Finally, Tenants maintain that they should have received a set-off for the repairs they made to the Building. On October 5, 2012, Tenants submitted an invoice to Landlords in the amount of $2,402.50; the repairs included, removing the previous tenant's furniture, trash, and debris, having carpets professionally cleaned, removing a previous tenant's commercial sign, trimming trees, replacing a lock and missing or damaged blinds, installing switch plates, repairing "Electric Strike (Door Opener)," and making copies of keys. Under the Lease, Pine agreed to "keep and maintain in good repair and working order

---

[10] Pine counters that, because it could not re-rent the Building for the full rental price of $2,500.00 per month, it should have been given damages to reflect the shortfall in rent payments. The record before us, however, contains no evidence of subsequent leases; further Pine provided no specific evidence regarding the shortfalls. The evidence of shortfall came from Bohlsen, who testified that the new rent "was less than what Indy Drains agreed to pay. I think it was, sort of, uh, a sliding scale lease where, I think, like the first few months were $1,800.00, $1,900.00 a month and then it slowly went up to, I think, now, probably, it's closer to $2,100.00 or $2,200.00 a month — something like that." *Tr*. at 93. This was insufficient evidence from which the trial court could have made a determination regarding damages Pine may have incurred due to a shortfall in rent.

and make repairs to and perform maintenance upon": (a) structural elements of the Building; (b) mechanical (including HVAC), electrical service . . . and below ground plumbing elements; (c) the roof of the Building; (d) exterior windows of the Building; and (e) all exterior lighting. *Appellant's App*. at 16. Pine also promised to make certain improvements and repairs, including replace worn or damaged carpeting throughout the Building. *Id*. at 24. Thereafter, Tenants offered to clean the carpeting in lieu of having Pine replace it, if Pine would make additional repairs.[11] Pine agreed, and Tenants paid $350.00 to clean the carpet; an amount that Pine should have reimbursed. The award of damages in the amount of $30,000.00 gave Tenants no credits against rent for the September rent payment, the security deposit, Pine's delay of Landlord Work, or set-offs for Tenants' repairs. Accordingly, we vacate the damages award on Pine's breach of contract claim and remand for the trial court to recalculate damages.

## II. Damages Awarded to Tenants

[24] Both Tenants and Landlords[12] challenge the trial court's decision to award $30,000.00 in damages to Tenants' on their Counterclaim; Tenants contend that the award is inadequate to cover their damages, and Landlords contend that the

---

[11] During the bench trial, Bohlsen testified that Pine agreed to replace the carpets in the Building as part of Landlord Work. Thereafter, Tenants negotiated with Pine, and Pine agreed, that instead of replacing the carpets, Tenants could clean the carpets, and Landlords would complete "stucco repair, and some other things to the [B]uilding." *Tr*. at 43-44.

[12] Bohlsen does not appeal the trial court's finding that both he and Pine are liable for any damages owed to Tenants.

award is excessive. Our review of a damages award is limited. *Sheek*, 993 N.E.2d at 287 (citing *Four Seasons Mfg.,* 870 N.E.2d at 507). We do not reweigh the evidence or judge the credibility of witnesses, and we will reverse an award only when it is not within the scope of the evidence before the finder of fact. *Id.* (citing *Four Seasons Mfg.*, 870 N.E.2d at 507). A factfinder may not award damages on the mere basis of conjecture and speculation. *Id.* (citing *Indianapolis City Mkt.*, 915 N.E.2d at 1024). Instead, the award must be supported by probative evidence. *Id.* In reviewing an award of damages, we do not require any particular degree of mathematical certainty. *I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.*, 695 N.E.2d 1030, 1037 (Ind. Ct. App. 1998), *trans. denied*.

[25] We begin by noting that Tenants raised claims of breach of contract, replevin, constructive eviction, retaliatory eviction, conversion, and trespass. Following the bench trial, the trial court found:

> Counterclaim Defendants [Landlords] entered into the Defendants' [Tenants'] business premises which was the subject of this lease and *removed vehicles, equipment and business property of the Defendants without the permission of the Defendants*. As a result of the Counterclaim Defendants engaging in this apparent attempt at self-help, they interfered with Defendants' business relationships with Defendants' customers which resulted in a loss of business and an attendant loss of revenue. The Court finds the Defendants/Counterclaim Plaintiffs have incurred damages in the amount of Thirty Thousand and 00/100 Dollars ($30,000.00).

*Appellants' App*. at 13 (emphasis added).  While the trial court cited to Landlords having engaged in self-help, it is not clear the precise claim or claims upon which the damages were awarded or why the award was in the amount of $30,000.00.[13]  However, the trial court's reference to the removal of Tenants' property without permission fits most closely with a claim of replevin or conversion.

[26]   In a replevin action, the only issue that must be decided is the right of the plaintiff to present possession.  *United Farm Family Mut. Ins. Co. v. Michalski*, 814 N.E.2d 1060, 1067 (Ind. Ct. App. 2004).  In order for a plaintiff to recover in an action for replevin, he must prove his title or right to possession, that the property is unlawfully detained, and that the defendant wrongfully holds possession thereof.  *Id*.  Judgment for the plaintiff may be for:  (1) the delivery of the property, or the value of the property in case delivery is not possible; and (2) damages for the detention of the property.[14]  Ind. Code § 32-35-2-33.  In replevin actions, the usual measure of damages would be the value of the loss of use, measured by the fair rental value, if possible.  *Roy Bayer Trust v. Red Husky, LLC*, 13 N.E.3d 415, 419 (Ind. Ct. App. 2014).  Apart from loss of use, the trial

---

[13] Tenants concede that the award was not granted in connection with the claim of trespass.  A plaintiff in a trespass action must prove that he was in possession of the land and that "the defendant entered the land without right." *Ind. Mich. Power Co. v. Runge*, 717 N.E.2d 216, 227 (Ind. Ct. App. 1999) (quotation omitted). In their Reply Brief, Tenants admit that the Lease gave Landlords the right to be on the premises upon default.

[14] The Agreed Order is not in the record before us; therefore, it is impossible to determine whether the Agreed Order resolved the replevin claim, and if so, whether the Agreed Order awarded damages to Tenants to compensate them for Landlord having removed Tenants' business property.

court in a replevin action may also award damages for any deterioration in the value of the property while in the hands of the defendant. *Id.*

[27] Tenants argue that they presented evidence that: (1) the three vans had a total value of $5,445.00; (2) the three trailers had a total value of $13,500.00; and (3) the estimated value of all the tools was $19,500.00. *Appellants' App.* at 46. The total value of Tenants' illegally removed business property amounted to $38,445.00, a value that Pine did not contradict. The trial court, however, made no determination of the value of the removed property.

[28] Indiana Code section 35-43-4-3 provides that a "person who knowingly or intentionally exerts unauthorized control over the property of another person commits criminal conversion." A civil action under the criminal conversion statute is permitted by Indiana Code section 34-24-3-1. That section allows a person who suffers a pecuniary loss as a result of a violation of Indiana Code Article 35-43 to bring a civil action against the person who caused the loss for: (1) an amount not to exceed three times the actual damages; (2) costs of the action; and (3) attorney fees. The plaintiff in a civil conversion action is required to prove these elements by a preponderance of the evidence. *SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758, 766 (Ind. Ct. App. 2011). "In order to establish a claim, a plaintiff must show a violation of one of the specific code sections and that such violation caused the loss suffered by the plaintiff." *Id.*

[29] Tenants claimed that they made an "unqualified demand" to Landlords "for return of the business property," but the Landlords refused to return the property. *Appellant's App.* at 42. Tenants asked for "treble dam[ag]es or three (3) times the amount due and owing, an amount Tenants estimated to be $115,335.00.[15] *Id.* at 42, 46. While it is not clear whether Landlords ever returned Tenants' business property, the evidence in the record before us reveals that Landlords had possession of Tenants' property from February 8, 2013 (the date it was removed) through at least April 24, 2015 (the date of the order in which trial court made a finding that Landlords were in contempt for failing to return the property). As noted above, the trial court made no determination of the value of the removed property, nor did it mention treble damages.

[30] Tenants presented evidence, including invoices, that it lost clients as a result of Landlords' illegal taking of the business property and that the loss of those clients resulted in $820,956.00 in estimated "total lost net revenue" for 2013 and 2014. *Appellant's App.* at 45-46, 48-66. The trial court acknowledged that Tenants had "a loss of business and an attendant loss of revenue." *Appellant's App.* at 13. Without further explanation, the trial court granted Tenants damages in the amount of $30,000.00. A damage award must be supported by probative evidence. *Four Seasons Mfg.,* 870 N.E.2d at 507. As the record does

---

[15] Tenants' claimed damages in the amount of $941,070.50, which reflected net lost profits; value of vans, trailers, and tools; storage fees for equipment and vehicles (for September through November of 2012, before Landlord had installed the fence); and repairs to the premises. *Tr.* at 206; *Appellant's App.* at 45-47. Tenants also requested attorney fees for the conversion action. *Tr.* at 207; *Appellant's App.* at 47.

not reflect how the trial court calculated the $30,000.00 damages award to Tenants, we reverse that award, finding that it is based on conjecture, speculation, or surmise. *See Whitaker v. Brunner*, 814 N.E.2d 288, 296 (Ind. Ct. App. 2004) ("The damage award cannot be based on speculation, conjecture, or surmise, and must be supported by probative evidence."), *trans. denied*.

[31] The parties do not appeal the trial court's findings that Tenants are liable to Landlords for breach of contract and that Landlords are liable to Tenants for having illegally removed their business property. Accordingly, we affirm the trial court's determination that Landlords and Tenants are each liable for damages. However, we reverse the trial court's damages awards, each in the amount of $30,000.00, finding that they are not supported by the evidence, and we remand the issue of damages to the trial court, instructing the court to: (1) identify the basis for awarding the damages under Tenants' Counterclaim; and (2) recalculate the damages awards, holding a new hearing on damages if necessary.

[32] Affirmed in part, reversed in part, and remanded with instructions.

[33] Riley, J., and Pyle, J., concur.