FILED
Sep 28 2023, 8:48 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT TRICOR
AUTOMOTIVE GROUP

F. Anthony Paganelli
Joshua R. Lowry
Paganelli Law Group
Indianapolis, Indiana


ATTORNEYS FOR APPELLANT
ALLEGIANCE ADMINISTRATORS LLC

John R. Maley
Peter J. Rusthoven
Kian J. Hudson
Barnes & Thornburg LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Douglas D. Church
Alexander P. Pinegar
Church Church Hittle & Antrim
Noblesville, Indiana

Stuart G. Parsell
Zieger, Tigges & Little LLP
Columbus, Ohio

# IN THE
# COURT OF APPEALS OF INDIANA

Tricor Automotive Group,

*Appellant-Plaintiff,*

and Allegiance Administrators
LLC,

*Appellant-Defendant,*

v.

Dealer VSC Ltd., and Haytham
Elzayn,

*Appellees-Defendants.*

September 28, 2023

Court of Appeals Case No.
22A-PL-1137

Appeal from the
Hamilton Circuit Court

The Honorable
Paul A. Felix, Judge

Trial Court Cause No.
29C01-2005-PL-3324

## Opinion[1] by Senior Judge Shepard
Judges Riley and Kenworthy concur.

---

[1] We held oral argument in this appeal on April 5, 2023, in the Court of Appeals Courtroom in Indianapolis. We commend counsel on their oral and written advocacy.

**Shepard, Senior Judge.**

[1] In 2018, Dealer VSC, Ltd. ("Dealer") and its sole owner Haytham ElZayn ("ElZayn") entered into a series of interrelated contracts with Tricor Automotive Group ("Tricor") pertaining to a business venture operated through Allegiance Administrators LLC ("Allegiance").[2] Eventually, questions arose as to whether a default event occurred under a binding Memorandum of Understanding ("MOU") that incorporated by reference several of these interrelated contracts. Tricor took contractual steps—individually and on behalf of Allegiance—as though a default occurred. However, Dealer and ElZayn maintained there was no default.

[2] Eventually, litigation arose between all four parties, culminating in the entry of summary judgment for Dealer and ElZayn on a series of claims and counterclaims. Tricor now appeals, asserting the trial court erred in granting

---

[2] For ease of reference, we provide the following record citations to interrelated contracts discussed herein:

- Formation and Contribution Agreement between Dealer and Tricor. See Appellant's App. Vol. II, pp. 206–220.
- Agreement for Purchase and Sale of Goodwill between Allegiance and ElZayn. See Appellant's App. Vol. III, pp. 122–37 (including amendment).
- Binding Memorandum of Understanding between Dealer, ElZayn, and Tricor. *See id.* at 138–41.
- Convertible Secured Promissory Note executed by Dealer in favor of Tricor. *See id.* at 142–45.
- Unit Pledge Agreement between Dealer and Tricor. *See id.* at 146–151.
- Initial Operating Agreement for Allegiance (owned by Dealer and Tricor). *See id.* at 5–81.
- Amended Operating Agreement for Allegiance. *See id.* at 82–121.

summary judgment to Dealer and ElZayn because—among other things—the designated evidence indicates that a default event occurred.

[3] Although the parties generally focus on whether there was a *financial* default, we ultimately conclude that a genuine issue of material fact exists as to whether an *operational* default occurred. In light of this potential default, Dealer and ElZayn are not entitled to summary judgment. We therefore reverse the grant of summary judgment and remand for further proceedings on the merits.

## Facts and Procedural History

[4] ElZayn is an Ohio resident with experience administering vehicle service contracts through entities he has formed, acquired, or controlled. One such company is Dimension Service Corporation ("Dimension"), an entity headquartered in Ohio. Tricor[3] is an Indiana Corporation that ElZayn does not control. Tricor's CEO is Joseph Campbell and its CFO is Brian Leslie.

[5] At some point, ElZayn and Campbell discussed a business venture involving the formation of Allegiance, an Ohio entity. The plan—as eventually outlined in several interrelated agreements—was for Allegiance to take over a line of business ElZayn currently ran through Dimension ("Assurant Line of Business"), with ElZayn overseeing the day-to-day business affairs by serving as

---

[3] At times, documents in this case refer to Tricor as "TAGUS" (Tricor Automotive Group US).

the CEO of Allegiance. In preparation, ElZayn formed Dealer—an Ohio entity he wholly owned—to hold equity in Allegiance. ElZayn then transferred to Dealer all of Dimension's contractual interest in the Assurant Business while reserving the personal goodwill associated with the Assurant Business.

[6] As a contribution to the business venture with Tricor, Dealer would transfer to Allegiance all contractual interest in the Assurant Business. Separately, Allegiance would purchase the personal goodwill from ElZayn. To fund Allegiance's purchase of the goodwill from ElZayn, Tricor would make a substantial capital contribution to Allegiance earmarked for the purchase. Tricor would ultimately have some protection in the business arrangement in that, if the Assurant Business fell short of targeted earnings, ElZayn would personally reimburse Allegiance up to $2 million, and Allegiance would distribute any reimbursement to Tricor as an excess capital contribution.

## The Agreements

[7] To carry out the agreement in principle, on April 1, 2018 ("Closing Date"), Dealer and Tricor executed a Formation and Contribution Agreement regarding the establishment and operation of Allegiance. *See* Appellants' App. Vol. II, pp. 205-220. The agreement contemplated the contemporaneous execution of several interrelated transactions, which was a condition to closing. Upon closing, Dealer would hold 51% of the interest in Allegiance and Tricor would hold the remaining 49% (each unit of interest, an "Allegiance Unit"),

with each party making an initial pro rata capital contribution. Allegiance would employ ElZayn as its CEO, with ElZayn performing the job duties outlined in Allegiance's Operating Agreement. Pursuant to the Operating Agreement, Allegiance would be managed by a Board of Managers.

[8] The Formation and Contribution Agreement addressed the plan for Allegiance to purchase the personal goodwill from ElZayn. That is, Recital (H) states:

> Allegiance . . . desires to acquire Mr. ElZayn's personal goodwill associated with the Assurant Business so that it can ensure the continued benefit derived from that goodwill. Thus, in addition to its cash contribution towards the initial capitalization of Allegiance [], [Tricor] also intends to contribute $7,000,000.00 in cash to Allegiance. . . . Pursuant to a personal goodwill purchase agreement (the "**Goodwill Purchase Agreement**") to be entered into between Allegiance . . . and Mr. ElZayn—as set forth in this Agreement—Allegiance . . . will use the contributed funds to purchase Mr. ElZayn's personal goodwill related to the Assurant Business.

Appellants' App. Vol. II, p. 207. Section 3(c) contains an acknowledgement that $7 million contribution would "be used by Allegiance . . . to purchase Mr. ElZayn's personal goodwill associated with the Assurant Business" through a separate agreement between Allegiance and ElZayn. *Id.* at 209.

[9] On the Closing Date, Allegiance and ElZayn executed that separate agreement, the Agreement for Purchase and Sale of Goodwill ("Goodwill Agreement"), with Allegiance paying ElZayn the $7 million in earmarked funds from Tricor.

[10]　The First Amendment to the Goodwill Agreement contains an earning contingency that protects Tricor in the event the Assurant Business did not reach an earning milestone. That is, the Goodwill Agreement provides that, if Allegiance's independently calculated net earnings ("EBITDA") from the Assurant Business were less than $3 million for the 12-month period ending June 30, 2019, ElZayn was obligated to reimburse Allegiance for the shortfall up to a maximum reimbursement of $2 million ("Goodwill Adjustment"). This conditional obligation is reflected in Section 4(b) of the Goodwill Agreement:

> 4.　　Consideration.
>
> * * *
>
> (b)　　Contingency: Adjustment to Purchase Price. The Purchase Price is expressly contingent upon Allegiance . . . producing, within the period beginning [July 1, 2018 and ending June 30, 2019][4] on the Effective Date and ending 12 months from the Effective Date, at least $3,000,000.00 in EBITDA from the Assurant Business (the "Earnings Contingency"). In the event [Allegiance] does not satisfy the Earnings Contingency, then the Purchase Price will be reduced dollar for dollar with the shortfall under $3,000,000.00 in EBITDA, up to a maximum reduction of $2,000,000.00. Within 90 days after failing to satisfy the Earnings Contingency, Mr. ElZayn will reimburse Allegiance . . . the difference between the Purchase Price that he received on the Closing Date, and the reduced Purchase Price as determined under the preceding sentence. Immediately upon being reimbursed any amount under this section 4(b), Allegiance . . . will distribute that same amount to [Tricor] as a return of capital,

---

[4] The parties amended the Goodwill Agreement to reflect this period. See Appellants' App. Vol. III, p. 135.

and will adjust the capital account maintained for [Tricor] accordingly.

Appellants' App. Vol. III, p. 124. The Goodwill Agreement does not define the term EBITDA or set forth a method for calculating EBITDA.

[11] On the Closing Date, Dealer and Tricor also executed an Operating Agreement adopting provisions for the operation of the entity that were consistent with the provisions in the Formation and Contribution Agreement.

[12] About one year later, Dealer sought a line of credit from Tricor. Dealer, ElZayn, and Tricor later executed the MOU,[5] under which Tricor agreed to provide a line of credit ("Loan Facility") in exchange for 6% of Dealer's interest in Allegiance, *i.e.*, 6 Allegiance Units. Under the terms of the MOU, Dealer would separately execute a convertible promissory note in favor of Tricor ("Note"), and ultimately pledge its 45 Allegiance Units as collateral for Dealer's draws on the Loan Facility. As a party to the MOU, ElZayn had certain rights and obligations. Although Allegiance was not a party, the MOU refers at times to Allegiance and the terms of its Operating Agreement.

[13] As a result of the transaction between Dealer and Tricor, Tricor's interest in Allegiance would increase from 49% to 55%, with Dealer holding 45%. If there

---

[5] Although we refer to this document as the MOU, it is undisputed that the MOU is a binding contract.

was an uncured event of default—as defined in Section 5 of the MOU—the pledged Allegiance Units would automatically convert to equity for Tricor, offsetting Dealer's then-existing debt. The MOU was designed so that Dealer's credit limit would correspond to the value of Dealer's equity, with regular resets to the credit limit ("Reset Limit") based on Allegiance's earnings. However, the Loan Facility was initially restricted by $2 million—the maximum-possible Goodwill Adjustment—awaiting a determination of whether ElZayn owed a Goodwill Adjustment because the Assurant Business had an earnings shortfall.

[14] Section 5 of the MOU addresses potential default events, providing as follows:

> A default under the . . . Note ("Default") shall be defined as (a) the failure to timely pay any interest due within 5 calendar days of notice from [Tricor] of failure to pay; (b) the failure to timely pay any amount due as the result of a principal reduction due to application of the Reset Limit; (c) *any material non-compliance by Mr. ElZayn, Dealer VSC or any related entities with the Operating Agreement, or the Contribution agreement, or any other agreements attached to or incorporated by reference in either the Operating Agreement or the Contribution Agreement* (collectively, the "Organizational Agreements"); (d) any actions of Dimension or related entities materially detrimental to [Allegiance]; or (e) the non-payment of all [Allegiance] receivables owed by Dealer VSC or any Affiliate Entity or other related entity within 30 days of the Effective Date, or thereafter with respect to new receivables as they become due. Written notice of non-payment of the Sec. 5(e) receivables shall be provided and 30 calendar days opportunity to cure. Except for the Sec. 5(a) interest payments and the Sec. 5(e) receivables, there shall be no right to notice or opportunity to cure with respect to any payment default. *[Tricor] shall provide written notice and 30 days opportunity to cure any other*

*material non-compliance with the Organizational Agreements or actions materially detrimental to [Allegiance]. In the event of any Default, Mr. ElZayn shall be deemed to have immediately resigned as President and CEO of [Allegiance].*

*Id.* at 139 (emphases added). Under Section 7, ElZayn's service as President and CEO was "subject to the terms of th[e] MOU[.]" *Id.* This Section specified that the parties—i.e., Dealer, Tricor, and ElZayn—"will amend [Allegiance's] Operating Agreement to reflect these and all other changes required to implement the terms and conditions of this MOU." *Id.* Section 8 prospectively addresses the issue of consent to changes, providing: "To the extent the written consent of the Members is required to enter into these transactions, or any of the matters covered by th[e] MOU, the Members' execution of this MOU shall meet that requirement and waive any other requirements in that regard." *Id.*

[15] Dealer executed the Note and Tricor provided the Loan Facility. Under the Note, Dealer was obligated to make monthly interest payments. However, Dealer's obligation to repay the principal was limited to certain scenarios. One scenario involved an uncured event of default. Upon an uncured event of default, Tricor had the authority under an acceleration clause to require repayment "without demand, notice or legal process of any kind[.]" *Id.* at 143.

[16] Dealer and Tricor separately executed a Unit Pledge Agreement. Thereunder, Dealer pledged its remaining Allegiance Units as collateral for its performance

under the Note and the MOU. The agreement specified that "[u]pon the occurrence of any [d]efault (as defined in the note and the MOU), [Tricor] shall have the right, on further notice to [Dealer] to transfer title to that number of [Allegiance] Units as required under the terms of the MOU[.] *Id.* at 146-47.

*Performance Disputes Under the Agreements*

[17] By September 30, 2019, Dealer had drawn $5.6 million on the Loan Facility, while remaining current with interest payments under the Note. Around this time, disputes arose as to the financial performance aspects of the interrelated agreements, including the proper way to calculate EBITDA to determine whether the Assurant Business fell short of the earnings target (thereby triggering ElZayn's obligation to reimburse Allegiance up to $2 million, a sum Allegiance would distribute to Tricor).

[18] An independent accounting firm ("Accounting Firm") began calculating EBITDA for the Assurant Business. During that process, Tricor told the firm that Tricor "expected . . . the[] EBITDA calculation . . . would result in a . . .[G]oodwill [A]djustment" and anticipated the adjustment would be the maximum of $2 million. Appellees' App. Conf. Vol. VII, p. 76.

[19] On September 30, 2019, Tricor sent a letter and an e-mail to ElZayn, who is listed as the notice recipient for Dealer in the Unit Pledge Agreement. In these communications, Tricor told ElZayn that he owed the maximum Goodwill

Adjustment of $2 million. ElZayn objected to the demand because the Accounting Firm had not yet completed its report and because he disputed there was an EBITDA shortfall resulting in any Goodwill Adjustment.

[20] On October 22, 2019, the Accounting Firm issued a compilation report, setting forth three different ways to calculate EBITDA. Each method resulted in a Goodwill Adjustment. The report reached no conclusion about which method of calculation was the contractually agreed method. An affidavit was prepared regarding the scope of the report. In pertinent part, the affidavit states:

> 10. The [Accounting Firm's] Compilation is the deliverable for the compilation performed by [the Accounting Firm] and purports to include the Assurant Business's EBITDA compiled under three scenarios described as follows:
>
>> Since Earnings Contingency was not fully defined in the agreement, management provided three scenarios for the computation[:] 1) all expenses except those directly associated with "Tricor" business were expenses associated with [the] Assurant [Business], these included certain legal and management fees, referred to as "Tricor"; 2) Expenses were allocated largely based on wage allocations provide [sic] by employees and the CEO, referred to as "Dealer VSC"; and 3) Expenses were allocated based on the Dealer VSC methodology, with some modifications to normalize them based on management's (CFO's) comments, referred to as "Normalized."
>
> 11. The three scenarios represent different assumptions regarding how Allegiance's expenses were allocated to the Assurant Business. [The Accounting Firm] testified that the information included in the . . . Compilation was provided by

Allegiance, including Brian Leslie ("Mr. Leslie"), Allegiance's CFO and other Allegiance employees. For each of the three scenarios, [the Accounting Firm] compiled the purported Assurant Business's EBITDA and the related Goodwill Adjustments as summarized in the following table.

Table 1

| As Labeled in the Munninghoff Compilation | EBITDA | Goodwill Adjustment |
|---|---|---|
| "Tricor Scenario"[8] | ($151,658) | $2,000,000 |
| "Dealer VSC Scenario"[9] | $1,868,652 | $1,131,348 |
| "Normalized Scenario"[10] | $945,355 | $2,000,000 |

Appellees' App. Vol. VI, pp. 5-6 (footnotes omitted).

[21] On October 24, 2019, Tricor sent another letter to ElZayn, a few days after the Accounting Firm had issued its final report. In the letter, Tricor asserted that, unless Tricor received the $2 million Goodwill Adjustment by November 4, 2019, it would "designate this amount as a draw against the Loan Facility[.]" Appellants' App. Vol. III, p. 176. ElZayn responded on October 28, 2019, disputing that he owed any Goodwill Adjustment, and objecting to Tricor's proposed treatment of the Goodwill Adjustment as a draw by Dealer.

[22] Tricor added the disputed $2 million Goodwill Adjustment to Dealer's Loan Facility, increasing the loan balance from $5.6 million to $7.6 million. On March 31, 2020, Tricor sent a letter to Dealer asserting that the Reset Limit of

the Loan Facility had been reduced to $3,362,093, and the "current amount drawn by Dealer . . . under the Loan Facility totals $7,600,000, exceeding the Reset Limit by $4,237,907." *Id.* at 179. Tricor demanded that Dealer bring the balance below the Reset Limit by paying the $4,237,907 by April 30, 2020.

[23] On April 30, 2020, Dealer paid Tricor $2,240,000. If the disputed Goodwill Adjustment was not treated as a draw on the Loan Facility, this payment would bring Dealer's balance below the Reset Limit. That is, assuming Dealer had a balance of only $5.6 million rather than $7.6 million, the payment would bring Dealer's balance to $3,360,000, which was below the Reset Limit of $3,362,903.

[24] On May 5, 2020, Tricor sent a letter to Dealer asserting that, based on Tricor's calculation, Dealer's payment was deficient by $1,997,907. Tricor further asserted that Dealer was in default under Section 5(b) of the MOU. Tricor told Dealer that, pursuant "to the Note, MOU and Unit Pledge Agreement, the balance in default automatically converts into that number of Units of [Allegiance] owned by Dealer . . . which have been pledged to secure the Loan Facility and satisfy [Dealer's] obligation." *Id.* at 182. Tricor asserted that, "[b]ased upon the balance due upon [d]efault and because conversion must occur in whole shares, 14 Pledged Units have been automatically converted and transferred to the ownership of [Tricor] in the records of Allegiance." *Id.* Tricor noted that "[t]his conversion results in a reduction of the outstanding loan by $2,091,969," an amount that would bring the balance under the Reset Limit.

*Id.* Tricor also informed Dealer that, based on the default, Tricor was invoking the acceleration clause and seeking immediate repayment of the alleged outstanding balance of $3,268,031. Tricor asserted that it had "automatically converted" an additional 22 Allegiance Units, resulting "in a reduction of the outstanding loan by $3,287,380 and a balance of $19,348" that was due to Tricor. *Id.* at 182. Nonetheless, Tricor offered Dealer "30 days to pay the outstanding balance and reclaim ownership of the 22 converted [Allegiance] Units . . . in the spirit of cooperation[.]" *Id.* At bottom, Tricor's position was that it now owned 91 Allegiance Units while Dealer held 9.

[25] Around the time Tricor sent the letter to Dealer asserting default, Tricor took steps to terminate ElZayn's salary and benefits as Allegiance's CEO. Tricor also told Allegiance's employees that ElZayn had "resigned" as of May 1, 2020. A few months later—ahead of a July 2020 meeting of Allegiance's Board of Managers—Campbell sought to add an agenda item concerning a proposed First Amended and Restated Operating Agreement for Allegiance ("Amended Operating Agreement") that was prepared by Tricor's outside counsel.

[26] As for pertinent provisions set forth in the initial Operating Agreement, Article 7.2 installed ElZayn as the initial CEO of Allegiance. Article 7.3 set forth the tenure of the CEO and provided limited grounds for removal, stating that the CEO would serve until the CEO's written resignation, permanent disability, or death. Article 7.7(a) stated that the Operating Agreement would be amended

with the unanimous consent of Allegiance's members—*i.e.*, Tricor and Dealer. However, at the same time, Section 5 of the MOU stated that, "[i]n the event of any [d]efault, Mr. ElZayn shall be deemed to have immediately resigned as President and CEO" of Allegiance. *Id.* at 139. Furthermore, Section 7 of the MOU stated that ElZayn would serve as CEO "subject to the terms of this MOU," specifying that "[t]he Parties" to the MOU—*i.e.*, Tricor, Dealer, And ElZayn—"will amend [Allegiance's] Operating Agreement to reflect these and all other changes required to implement the terms and conditions of this MOU." *Id.* Moreover, Section 8 of the MOU stated: "To the extent the written consent of the Members is required to enter into these transactions, or any of the matters covered by th[e] MOU, the Members' execution of th[e] MOU shall meet that requirement and waive any other requirements in that regard." *Id.*

[27] The proposed First Amended and Restated Operating Agreement contained suggested revisions concerning, among other things, which actions would require the unanimous consent of the members, and who would have authority to oversee Allegiance's day-to-day affairs. As to daily affairs, the proposed revisions would shift power away from the CEO—at that point identified as ElZayn in the Operating Agreement—and instead vest that power in the Board.

[28] ElZayn, a member of the Board of Managers, objected to the Board's consideration of the proposed First Amended and Restated Operating

Agreement, arguing that (1) considering the document was outside the authority of the Board and (2) amending the Operating Agreement required the unanimous approval of the members, not a vote by the Board. The Board ultimately took a vote, with a majority of the Board voting to adopt the Amended Operating Agreement. The meeting minutes reflect a discussion about whether, despite ElZayn's insistence that the initial Operating Agreement called for unanimous member consent to an amendment, "the MOU language required amendment of the [O]perating [A]greement and . . . this was not done." Appellees' App. Vol. III, p. 54.

## Procedural History[6]

On May 8, 2020, Tricor filed its complaint in Hamilton County against Dealer, ElZayn, and Allegiance. In Count I, Tricor sought a declaratory judgment that, among other things, Dealer and ElZayn had committed "acts or omissions required by the loan documents . . .constitut[ing] a default under the loan documents." Appellees' App Vol. II, p. 228. In Count II, Tricor asserted that ElZayn and Dealer breached the MOU, the Note, and the Unit Pledge Agreement, and that there had been an event of default. *See id.* at 228-29.

On February 3, 2021, Dealer and ElZayn filed several counterclaims and crossclaims revolving around Tricor's declaration of default, the treatment of

---

[6] There are other pending actions between the parties, and the present case involved several rulings ahead of summary judgment. In reciting the procedural history, we focus on events germane to resolving this appeal.

the Goodwill Adjustment as a draw on the Loan Facility, Tricor's control of certain pledged units, and the validity of the amendment to the Operating Agreement. Specifically, Count 1 alleges Tricor is liable for breach of the MOU for (1) designating the alleged Goodwill Adjustment as a draw on the Loan Facility and (2) "[f]alsely claiming and declaring a default" by Dealer and/or ElZayn because Dealer and ElZayn "have fully performed their respective obligations under the MOU and other agreements with Tricor and Allegiance." Appellant's App. Vol. II p. 182. Count 2 contains similar allegations, asserting that Tricor's actions amounted to a breach of the Note. Count 3 focuses on whether Tricor breached the Unit Pledge Agreement by, among other things, "wrongfully exercis[ing] dominion and control" over the pledged Allegiance Units. *Id.* at 183-84. Count 4 similarly alleges that Tricor converted the pledged Allegiance Units in exercising control over certain units. As for Count 5—which seeks a declaratory judgment—Paragraph 120(G) challenges the adoption of the First Amended and Restated Operating Agreement. *Id.* at 187.

[31] On May 18, 2021, Dealer and ElZayn moved for summary judgment on Tricor's two claims as well as certain counts in their pleading: Counts 1 through 4 and Paragraph 120(G) of Count 5. On October 7, 2021, Tricor filed a competing motion, seeking summary judgment on its two claims for relief.

[32] The trial court granted Dealer and ElZayn's motion for summary judgment and denied Tricor's motion. Appellants' App. Vol. II, pp. 47-81 (Appealed Order).

Its order includes several declarations, among them: (1) "Neither Dealer VSC nor Mr. ElZayn committed a Default as defined in Section 5 of the MOU"; (2) "Tricor lacked any authority, right[,] or basis to convert Dealer VSC's membership Units in Allegiance"; (3) "Dealer VSC is the rightful owner of 45 membership Units of Allegiance" (*i.e.*, all pledged units); and (4) amendments to the Operating Agreement were improper, rendering the First Amended and Restated Operating Agreement "invalid and null and void." *Id.* at 80.

[33] Tricor now appeals. In this interlocutory appeal, Tricor does not challenge the denial of its motion for summary judgment. Instead, Tricor focuses on whether the trial court erred by granting summary judgment to Dealer and ElZayn.

## Issues

[34] Although several issues were presented for our review, the following question is dispositive in this appeal.

> Did the trial court err by granting Dealer's and ElZayn's motion for summary judgment as to the first and second claims of Tricor's complaint and on several of Dealer's and ElZayn's counterclaims and cross-claims when there is a genuine issue of material fact as to whether an operational default occurred?

# Discussion and Decision

## Standard of Review[7]

"We review summary judgment de novo, applying the same standard as the trial court." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting Ind. Trial Rule 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Williams*, 914 N.E.2d at 761 (internal citations omitted).

"The initial burden is on the summary-judgment movant to 'demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue,' at which point the burden shifts to the non-movant to 'come forward with contrary evidence'

---

[7] At this stage, the parties do not actively dispute that Indiana is a proper forum and Indiana law governs this appeal. In any case, we note that the interrelated documents at times refer to Indiana and at other times refer to Ohio. Under the substantive law of both Indiana and Ohio, "[w]here no conflict of laws exists, the law of the forum controls." *ISCO Indus., Inc. v. Great Am. Ins. Co.*, 148 N.E.3d 1279, 1283 (Ohio Ct. App. 2019); *Rodriguez v. Rodriguez*, 818 N.E.2d 993, 996 (Ind. Ct. App. 2004) ("Where Indiana and Illinois law is the same, the trial court should apply the law of the forum."), *trans. denied*. And, here, we discern no germane conflict of laws. Thus, we apply Indiana law in reviewing the ruling on summary judgment.

showing an issue for the trier of fact.'" *B & R Oil Co., Inc. v. Stoler*, 77 N.E.3d 823, 827 (Ind. Ct. App. 2017) (quoting *Williams*, 914 N.E.2d at 761-62), *trans. denied*. "And, '[a]lthough the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court.'" *Id.* (quoting *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted)).

[37] In this appeal, we are asked to interpret several contracts. "Interpretation and construction of contract provisions are questions of law." *B & R*, 77 N.E.3d at 827. "As such, cases involving contract interpretation are particularly appropriate for summary judgment." *Id.* "And because the interpretation of a contract presents a question of law, it is reviewed *de novo* by this court." *Id.*

[38] "We review the contract as a whole, attempting to ascertain the parties' intent and making every attempt to construe the contract's language 'so as not to render any words, phrases, or terms ineffective or meaningless.'" *Id.* (quoting *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007)). "And, in reading the terms of a contract together, we keep in mind that the more specific terms control over any inconsistent general statements." *Id.* at 827-28 (quoting *DLZ Ind., LLC v. Greene Cty.*, 902 N.E.2d 323, 328 (Ind. Ct. App. 2009)).

## Analysis

[39] Tricor challenges the trial court's decision to grant Dealer's and ElZayn's motion for summary judgment, which concerned the first and second claims of Tricor's complaint and several counterclaims/cross-claims.[8] In briefing and at oral argument, the parties implicitly agree that the propriety of granting summary judgment to Dealer and ElZayn turns largely on whether the designated evidence shows there was an uncured default event under the MOU. Generally, the parties focus on whether Tricor could add the alleged EBITDA shortfall—the Goodwill Adjustment—to the debt and, if so, whether there was a financial default due to nonpayment of the increased loan balance. However, the MOU does not limit the definition of default to a financial default arising from underpayment on the Note. Rather, independent of Dealer's financial obligations under the Note, the MOU refers to the parties' interrelated contracts and states that an *operational default* occurs upon any material breach.

[40] For the reasons herein, we conclude that the designated evidence discloses a potential operational default premised on ElZayn's material breach of the Goodwill Agreement for failing to reimburse Allegiance for an EBITDA shortfall. Because of the contractual consequences for an operational default,

---

[8] Because Tricor does not challenge other aspects of the appealed order, we need not address them. Moreover, for ease of reading, we hereafter use the term counterclaim to refer to a counterclaim/cross-claim.

this genuine issue of material fact is dispositive, showing that Dealer and ElZayn are not entitled to summary judgment on the claims and counterclaims.

## Operational Default Under the Agreements

[41] Under the MOU, there is an event of operational default if Dealer or ElZayn materially breach (1) the Operating Agreement; (2) the Contribution Agreement; or (3) any other agreement attached to or incorporated by reference in either the Operating Agreement or the Contribution Agreement. Appellants' App. Vol. III, p. 139. The Contribution Agreement refers to the Goodwill Agreement, which is attached as an exhibit to the Contribution Agreement. Appellants' App. Vol. II, pp. 209 (¶3(c))-10(¶4(b)(iii)). Thus, upon a material breach of the Goodwill Agreement, there is a default event under the MOU.

[42] As to the Goodwill Agreement—under which Allegiance purchased from ElZayn the personal goodwill associated with the Assurant Business—if there is an EBITDA shortfall (*i.e.*, if the Assurant Business does not reach targeted earnings), ElZayn is obligated to reimburse Allegiance up to $2 million. Appellants' App. Vol. III, p. 135 (¶ 2(a)). Because the parties disagree as to the proper EBITDA calculation, there is a genuine issue of material fact as to whether an EBITDA shortfall exists. Moreover, assuming—as we must at this point—that Tricor's EBITDA calculation controls, the designated evidence indicates that (1) the Assurant Business resulted in an EBITDA shortfall and (2) ElZayn failed to reimburse Allegiance as required. Thus, the designated

evidence shows a genuine issue of material fact as to whether ElZayn materially breached the Goodwill Agreement by failing to pay the Goodwill Adjustment to Allegiance, an event of material breach that would result in an operational default under the MOU.

[43] At times, Dealer and ElZayn point out that the default provisions in the MOU set forth a notice and cure period. Indeed, in defining default, the MOU states that Tricor generally "shall provide written notice and 30 days opportunity to cure any . . . material non-compliance with the Organizational Agreements or actions materially detrimental to [Allegiance]." *Id.* at 139. According to Dealer and ElZayn, Tricor failed to give notice of an EBITDA shortfall, so there could be no liability for default under the MOU. Yet, the designated evidence includes October 2019 correspondence from Tricor to ElZayn wherein Tricor alerts ElZayn to an EBITDA shortfall. *See id.* at 176. And, ElZayn was designated as a notice recipient for Dealer under the Pledge Agreement. *See id.* at 149. Therefore, in light of the October 2019 correspondence regarding an EBITDA shortfall, there is a genuine issue of material fact as to whether Tricor gave effective notice to Dealer and ElZayn that there was an event of operational default under the provisions of the MOU.

[44] We turn to the contractual consequences for an uncured operational default under the MOU. In this scenario, the MOU calls for a change in leadership, providing: "In the event of any [d]efault, Mr. ElZayn shall be deemed to have

immediately resigned as President and CEO of [Allegiance]." *Id.* at 139. In a separate clause, the MOU expressly conditions ElZayn's continued service as CEO on "the terms of this MOU," further providing that the parties would "amend the [Allegiance] Operating Agreement to reflect these and all other changes required to implement the terms and conditions of this MOU." *Id.*

[45] The MOU also provides that an operational default results in "[a] default under the . . . Note." *Id.* The Note contains a corresponding provision, stating that a default under the Note "shall be defined to have occurred as provided in the MOU." *Id.* at 143. With respect to default, the Note contains an acceleration clause specifying that, upon default, Tricor may consider "all unpaid amounts under th[e] Note . . . immediately due and payable, without demand, notice or legal process of any kind[.]" *Id.*

[46] Turning to the Unit Pledge Agreement—wherein Dealer pledged all its Allegiance Units as collateral for the loan—Tricor is protected in the event of "any [d]efault . . . as defined in the Note and the MOU[.]" *Id.* at 146. The agreement specifies that Tricor has "the right, on further notice to [Dealer], to transfer title to Tricor" the number of pledged units necessary to satisfy Dealer's debt under the loan. *Id.* Moreover, although the Unit Pledge Agreement sets forth certain contingencies when there is a "non-payment [d]efault" (*i.e.*, a default arising for some reason other than Dealer's failure to pay amounts due on the Note), those contingencies do not modify Tricor's right to obtain title to

one or more of the Allegiance Units. *See id.* at 146-147 (Unit Pledge Agreement: Procedure Upon Default ¶1.3). Further, so long as there is $.01 of debt on the loan, Tricor has the right to at least one Allegiance Unit because the Unit Pledge Agreement prohibits the transfer of fractional units. *See id*. at 147 (providing that "fractional units are not issued" in the transfer of units). Instead, Tricor must reimburse Dealer for any difference between the debt on the MOU Loan Facility and the value of the transferred Allegiance Unit.

[47] All in all, based on the designated evidence, there are genuine issues of material fact as to whether (1) there was an EBITDA shortfall, (2) Tricor gave effective notice of that shortfall, triggering the cure period in the MOU, and (3) ElZayn failed to reimburse Allegiance for the EBITDA shortfall, resulting in a material breach of the Goodwill Agreement and an operational default under the MOU. The uncured default event would permit Tricor to unilaterally invoke the acceleration clause and satisfy the debt by obtaining title to a corresponding number of pledged Allegiance Units. The uncured default event would also result in Dealer's consent to modify the Operating Agreement as needed to implement the consequences of the operational default, including consent to modify the Operating Agreement to divest ElZayn of executive authority.

[48] We turn now to the interplay between an operational default and the claims upon which the trial court granted summary judgment to Dealer and ElZayn.

## Operational Default and the Motion for Summary Judgment

### *Dealer's and ElZayn's Motion for Summary Judgment on Tricor's Complaint*

We begin by analyzing whether Dealer and ElZayn are entitled to summary judgment on Tricor's Amended Complaint, which sets forth two claims: (1) "Declaratory Judgment: EBITDA Calculation"; and (2) "Breach of Contract: Convertible Promissory Note[.]" Appellees' App. Vol. II, pp. 227-29.

### First Claim

In its First Claim, Tricor sought a declaratory judgment as to the EBITDA Calculation. *Id.* at 227-28. As part of that judgment, Tricor asked the trial court to broadly declare that, apart from any liability for "fail[ure] to pay amounts due" under the Note, there were "other acts or omissions required by the loan documents" that "constitute a default under the loan documents." *Id.* at 228. As earlier discussed, the designated evidence shows the possibility of an operational default. And an operational default would constitute a default under the loan documents. Appellants' App. Vol. III, p. 139 (MOU ¶5(c)). Therefore, Dealer and ElZayn did not meet their burden of demonstrating they are entitled to summary judgment on Tricor's First Claim.

### Second Claim

In its Second Claim, Tricor alleged a breach of contract with respect to the Note. Although aspects of the claim focus on non-operational default, the claim encompasses a broad allegation that Dealer and ElZayn were liable to

Tricor under the terms of the Note. The Note includes a provision incorporating "all of the rights and powers set forth in the MOU and the Security Documents . . . as though they were set forth in this Note." *Id.* at 142-43. One of those rights and powers would be to recover for liability based on an operational default. Thus, because the designated evidence does not preclude operational default, Dealer and ElZayn did not demonstrate that they are entitled to summary judgment on Tricor's Second Claim.

### *Summary Judgment as to Dealer's and ElZayn's Counterclaims*

## Count 1

[52] Turning to Dealer's and ElZayn's counterclaims, Count 1 contains an allegation that Dealer and ElZayn "have fully performed their respective obligations under the MOU and other agreements with Tricor and Allegiance." Appellants' App. Vol. II, p. 182. However, the designated evidence indicates that ElZayn did not fully perform his obligations under the Goodwill Agreement because he did not pay Allegiance for the EBITDA shortfall. Furthermore, Count 1 includes an allegation that Tricor "[f]alsely claim[ed] and declar[ed] a default," resulting in Tricor's "material breach[] of the MOU[.]" *Id.* Yet, as earlier discussed, the designated evidence indicates there is a genuine issue of material fact as to whether Tricor had grounds to declare a default.

[53] For these reasons, we conclude that Dealer and ElZayn did not demonstrate that they are entitled to summary judgment on Count 1 of their counterclaims.

## Count 2

[54] In Count 2, Dealer and ElZayn alleged that Tricor breached the Note by falsely declaring a default under the Note. However, the Note contains a provision incorporating all of Tricor's "rights and powers set forth in the MOU," Appellants' App. Vol. III, pp. 142, and the MOU provides that an operational default results in "[a] default under the . . . Note." *Id.* at 139. Further, the Note states that a default "shall be defined to have occurred as provided in the MOU." *Id.* at 143.

[55] Because the designated evidence allows for an operational default premised on ElZayn's failure to pay the Goodwill Adjustment, Dealer and ElZayn did not show they are entitled to summary judgment on Count 2 of their counterclaims.

## Counts 3 and 4

[56] In Count 3, Dealer and ElZayn allege Tricor breached the Unit Pledge Agreement by—among other things— "wrongfully exercis[ing] dominion and control over the Collateral," *i.e.*, the Allegiance Units. Appellants' App. Vol. II, pp. 183-84. Similarly, in Count 4, Dealer and ElZayn allege Tricor committed conversion by exercising dominion and control over the Allegiance Units. However, as earlier discussed, an operational default generates certain rights

under the interrelated contracts, including Tricor's right to accelerate the debt and transfer title to at least one Allegiance Unit. *See* Appellants' App. Vol. III, p. 147 (providing that "fractional units are not issued" in the transfer of units).

[57] Upon the designated evidence, Dealer and ElZayn have not shown that they are entitled to summary judgment on Counts 3 and 4 of their counterclaims.

**Count 5**

[58] As for Count 5, in which Dealer and ElZayn requested a declaratory judgment, they sought in Paragraph 120(G) a declaration that "the MOU . . . does not permit Tricor to unilaterally adopt such Amended Operating Agreement without Dealer VSC's consent." Appellants' App. Vol. II, p. 187. One change to the Operating Agreement was to Section 7.1, concerning the management of Allegiance. That change gave the Board of Managers—instead of ElZayn—the authority to manage Allegiance's day-to-day business operations. *Compare* Appellants' App. Vol. III, p. 22 (old) with Appellees' App. Vol. III, p. 22 (new). When the Operating Agreement was amended, Dealer remained a member of Allegiance in that Tricor claimed to hold 91 Allegiance Units while Dealer held 9. Appellants' App. Vol. II, p. 202 (ElZayn May 17, 2021 Ohio State court affidavit).

[59] Looking exclusively at the Operating Agreement, Tricor could not unilaterally amend the governance document because of Section 7.7(a), which requires unanimous member consent for this type of action. Appellants' App. Vol. III,

p. 26 (Operating Agreement ¶7.7(a) (Action Requiring Unanimous Consent of Members)). Yet, for the following reasons, the designated evidence indicates that Section 7.7(a) does not control due to the potential operational default.

[60] That is, Paragraph 5 of the MOU provides for a change in executive leadership upon default, specifying that "ElZayn shall be deemed to have immediately resigned as President and CEO of [Allegiance]." *Id.* at 139. Furthermore, Paragraph 7 of the MOU provides that ElZayn "shall continue (subject to the terms of the MOU) as the Company's CEO and President, with the same duties and obligations." *Id.* That paragraph further directs that the parties "will amend the Company's Operating Agreement to reflect these and all other changes required to implement the terms and conditions of this MOU." *Id.*

[61] The original Operating Agreement identifies ElZayn as the CEO and sets forth only limited ways in which he could be removed: upon written resignation, permanent disability, or death. *See id.* at 23 (Operating Agreement ¶7.4 (Resignation)). In sum, then, if there is an operational default—which is a surviving theory of liability based on the designated evidence—at least some modification to the Operating Agreement would be permissible to give effect to terms in the MOU stating that ElZayn was "deemed to have immediately resigned as President and CEO of [Allegiance]." *Id.* at 139. Thus, there is a genuine issue of material fact precluding summary judgment as to Paragraph 120(G) of Count 5, which challenges all changes to the Operating Agreement.

## Conclusion

[62] We conclude that the entry of summary judgment in favor of Dealer and ElZayn was premature based on the record and reverse the court's decision. Accordingly, we reverse and remand to the trial court for further proceedings on the merits.

[63] Reversed and remanded.

Riley, J., and Kenworthy, J., concur.